AERO CORPORATION, Plaintiff,

v.

DEPARTMENT OF THE NAVY, Defendant.

Civ. A. No. 79–2944.

United States District Court, District of Columbia.

Feb. 18, 1982.

As Amended April 26, 1982.

Roger N. Boyd, Jean-Pierre Swennen, Frederick W. Claybrook, Jr., Washington, D. C., for plaintiff.

Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, Kenneth M. Raisler, Asst. U. S. Attys., Barbara McBride, Washington, D. C., for defendant.

MEMORANDUM

OBERDORFER, District Judge.

*Introduction*

There is before the Court the ongoing dispute arising from claims by Aero Corporation, now supported by opinions[1] of the Acting Comptroller-General released June 5, 1981, and September 9, 1981, that the Department of the Navy has violated its duties under the Armed Services Procurement Act ("ASPA"), 10 U.S.C. §§ 2301–2737, and Section 3 of the Armed Services Procurement Regulations ("DAR"), *see* 32 C.F.R. parts 1–39 (vol. 1). The specific provision of ASPA that plaintiff claims defendant has violated is 10 U.S.C. § 2304(g), which creates a requirement that procurements, even if they cannot be competed through formal advertising,[2] must, if possi-

---

**1.** These opinions, requested by the Court at a hearing on August 12, 1980, took the form of letters to the Court. The nature of the proceedings in the General Accounting Office that resulted in the Acting Comptroller-General's decisions is summarized *infra* at pp. 188–189.

**2.** A procurement officer may elect not to use formal advertising to secure bids under authority of 10 U.S.C. § 2304(a). *See* 10 U.S.C. § 2304(a)(10) (formal advertising not required if "it is impracticable to obtain competition" for the contract.)

ble, be awarded on the basis of competitive negotiation with all qualified potential contractors. That section provides in relevant part:

> In all negotiated procurements in excess of $10,000 . . . in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured. . . .

10 U.S.C. § 2304(g). Even when a noncompetitive, or "sole source," negotiated procurement is permissible under section 2304(g), the regulations require the contracting officer to take steps to avoid unnecessary subsequent sole-source procurements, and to position himself to compete, if possible, any subsequent contracts related to the sole-source contract. As Armed Services Procurement Regulation ¶ 3–101(d) provides in pertinent part:

> Negotiated procurements shall be on a competitive basis to the maximum practical extent. When a proposed procurement appears to be necessarily noncompetitive, the contracting officer is responsible not only for assuring that competitive procurement is not feasible, but also for acting whenever possible to avoid the need for subsequent noncompetitive procurements. This action should include both examination of the reasons for the procurement being noncompetitive and steps to foster competitive conditions for subsequent procurements, particularly as to the availability of complete and accurate data . . . and possible breakout of components for competitive procurement. . . .

32 C.F.R. parts 1–39, vol. 1, at 327 (1979) [hereinafter cited without reference to the Code of Federal Regulations as "DAR ¶ 3–101(d)"]. Without conceding that defendant's actions were to any extent lawful under section 2304(g), plaintiff also con-tends that defendant's conduct violated the separate express obligations of DAR ¶ 3–101(d).

The dispute and the litigation derive from decisions by the Chief of Naval Materiel ("CNM") to award to Lockheed-Georgia Corporation ("LGC") a series of contracts for the overhaul of 49 propeller-driven C–130 airplanes manufactured for the Navy by LGC in the 1950's and thereafter. Defendant began to award the overhaul contracts to LGC in November 1979, and LGC has now been designated as the overhaul contractor for all 49 aircraft. The overhaul program is designated as a "Service Life Extension Program" ("SLEP"), and has as its purpose to increase the number of allowable safe flight-hours for aircraft that otherwise would need to be retired from use. The determinations made by the Navy concerning the C–130 SLEP undertaking were to procure the necessary overhaul work on all 49 aircraft through a negotiated procurement, rather than by formal advertising, and further to negotiate contracts for all 49 aircraft on a "sole-source" basis from LGC. The contracting officer has asserted that, under the circumstances of this case, section 2304(g) did not require a competitive negotiation.

The decision to award SLEP contracts on a sole-source basis was based upon a determination by the commander of the Naval Air Systems Command ("NAVAIR") that no contractor other than LGC could perform the overhaul on the C–130 aircraft designated for SLEP until LGC had furnished to that contractor the "kits" needed to accomplish the roughly 40 major individual overhaul tasks NAVAIR intended for each airplane.[3] LGC had indicated to NAVAIR that it would require a very long time to furnish such kits to another aerospace firm. NAVAIR decided, in essence, that the Navy's C–130 aircraft were in such bad condition that if overhaul were delayed

---

**3.** SLEP "kits" have three components: a complete set of parts known to be needed prior to commencement of the overhaul for installation on an aircraft; the tools a contractor would otherwise not possess that are needed for overhaul; and the working-papers, or "technical directives," that sufficiently describe each task to be performed in the overhaul. *See* C–130 Service Life Extension Program Monitoring Study Final Report [hereinafter "Final Report"] §§ 8.3.1–8.3.3 at 8–3 (dated Sept. 1, 1981).

for the time LGC represented to NAVAIR would elapse before the required kits could be furnished, many of the aircraft would become unsafe and would be grounded. That result, NAVAIR concluded, would jeopardize the critical fleet missions for which the Navy and the Marine Corps operate the aircraft.

Plaintiff has contended that the CNM, NAVAIR and LGC (on whom the CNM and NAVAIR heavily depend in calculation of the timetable for possible kit manufacture) failed to consider in sufficient depth the fact that plaintiff and at least one other aerospace firm, Hayes International Corporation ("Hayes"), have for many years performed elaborate maintenance service on Navy, Air Force, and Marine Corps C–130 aircraft as so-called "Standard Depot Level Maintenance" ("SDLM") and "Programmed Depot Maintenance" ("PDM") contractors. That experience, plaintiff claims, was ignored by the Navy to such a degree as to make defendant's decisions to procure SLEP for the C–130 aircraft on a sole-source basis irrational and a violation of section 2304(g) of ASPA and DAR ¶ 3–101(d).

In its two opinions prepared for the parties and the Court, the General Accounting Office ("GAO") concluded that competitive SLEP procurement was possible for some of the Navy's C–130 fleet currently scheduled for induction in the program, and found the Navy's rejection of competitive options "premature" in light of those possibilities. GAO determined, however, that the Navy properly could insist that any SLEP contractor other than LGC use kits in performing SLEP overhaul on the C–130. GAO also found that the opportunities for competition might be increased if competitive negotiation were limited to experienced C–130 maintenance contractors like Aero, Hayes, and LGC, because the kits needed for SLEP accomplishment by firms with the experience of Hayes and Aero would be less complex and could be furnished before the kits needed to assist industry-wide competition. GAO's determinations were based upon documentary submissions and briefs filed by plaintiff, defendant, and LGC.

After careful consideration of the elaborate GAO opinions, the voluminous documentary evidence considered by GAO, the memoranda filed by counsel, and the testimony adduced at several hearings (including testimony by the present commander of NAVAIR and the expert testimony of LGC employees), the Court is persuaded that plaintiff probably will prevail on the merits of many of its most important contentions.[4] The Court will probably conclude that the Navy decisions to employ sole-source procurement for *all* 49 aircraft was unlawful. The Court will probably conclude that the Navy, beginning in 1979, so "transgressed the statutory boundaries"[5] as to render the contracts and options since awarded to LGC for SLEP of many of the aircraft invalid. Additionally, the Court is likely to find that defendant has repeatedly breached its duties under DAR ¶ 3–101(d), as well as its obligations under this Court's Order of March 4, 1980, to take steps to reconsider and minimize noncompetitive negotiated procurements.

After assessing the effects of defendant's continued preclusion of competition on plaintiff and on the public interest, as well as the possible impact of preliminary injunctive relief on the public interest and the allocation of power among the executive, legislative, and judicial branches of government, the Court has determined that af-

---

4. At the Court's request, the United States Attorney's Office, in consultation with plaintiff's counsel, prepared and filed on November 16, 1981 a multiple-volume submission consolidating all filings in this action as of that date and most documents submitted in the related GAO proceedings since March 4, 1980. The materials contained therein are hereinafter generally cited as "Consolidated Record" or "C.R." and according to document number in the tabular index that accompanied the filing, rather than by date of filing in Civil Action No. 79–2944 or date of transmittal to GAO. Defendant having filed the materials and there being no objection to the proffer, they are all received in evidence.

5. *Calcutta East Coast of India & East Pakistan Conference v. Federal Maritime Com'n*, 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968).

firmative interim relief is required in this case. Accordingly, an accompanying Order will direct defendant to begin engineering design for a kit-assisted competitive negotiation that would permit competitive award of SLEP contracts on as many aircraft as possible in the C–130 fleet scheduled by NAVAIR for SLEP accomplishment. The Order will leave undisturbed the schedule of SLEP inductions established by NAVAIR, and requires no action inconsistent with timely and uninterrupted SLEP accomplishment for the fleet. The Order does, however, require defendant to conduct the competitive procurement required by Congress unless and until the Secretary of the Navy or his delegate credibly and rationally determines that the costs of competitive negotiation or the risks attendant to such a procurement relieve the Navy from the mandate for competition under 10 U.S.C. § 2304(g) and DAR ¶ 3–101(d).

## FINDINGS OF FACT

*Background*

1. When this action was filed in 1979, NAVAIR had proposed to contract on a sole-source basis for overhaul of a total of 49 C–130 aircraft.[6] On cross-motions for summary judgment and plaintiff's motion for a preliminary injunction, the Court ruled on March 4, 1980 that the Navy's decision to award contracts for overhaul of 13 C–130 aircraft to LGC in the SLEP

program and to give LGC an option for SLEP contracts for an additional seven aircraft was not unlawful, even though the contracts were negotiated without competition. *Aero Corp. v. Department of the Navy*, 493 F.Supp. 558, 556–67 (1980). With respect to the other 29 aircraft that the Navy planned to overhaul in the SLEP program, however, the Court emphasized that

> [t]he mandate of section 2304(g) of the [Armed Services Procurement] Act .... is clear[:] ... competition is required to the maximum extent feasible by solicitation of proposals "from the maximum number of qualified sources consistent with the nature and requirements of the supplies and services to be produced."

493 F.Supp. at 568. Thus the Court found that while the decision not to compete the first 20 SLEP contracts was not unreasonable, the same could not be said for NAVAIR's plan to contract for the remaining 29 without competition.

2. The Court further found in its March 1980 decision that the timing of the process used by the Navy in deciding to award the SLEP contracts to the original C–130 manufacturer had finessed plaintiff's efforts to make a timely protest to the General Accounting Office, and had denied plaintiff an opportunity for timely judicial review of the sole-source decision as to the first 20 aircraft.[7] Reviewing the Navy's deliberate

---

**6.** It developed at the hearing on plaintiff's motion for a preliminary injunction held September 25, 1981, that NAVAIR has recently identified eight C–130s in addition to the original 49 for possible overhaul in SLEP. Proposals to perform SLEP on those additional aircraft appear not, however, to have reached the stage where firm budgetary approval for the additional expenditure has been sought or obtained. C.R. 94 at 107–08.

**7.** Navy planning for SLEP of the C–130 had begun in 1977. As the Court found in the March 1980 decision, Aero had filed a protest at GAO on March 26, 1979, challenging a decision by the SLEP project manager to propose sole-source procurement from LGC. Aero's protest was dismissed on June 5, 1979 on the basis of the Navy's representations that the Navy had not yet made a decision as to procurement method for SLEP. Later in June 1979 a board of Navy officers and engineering

personnel responsible for advising the procurement officer in charge of SLEP recommended sole-source procurement, and early in July, approximately six weeks after obtaining dismissal of the protest by Aero, the Navy official in charge of SLEP procurement elected to make an initial sole-source SLEP procurement for at least ten aircraft.

By the time the issues became ripe for review by GAO and actionable in the district court in the fall of 1979, the Navy argued that the critical nature of the SLEP induction schedule, besides making competition impossible, made extremely dangerous any delay that might be occasioned by the judicial process or GAO review. The Navy did not explain to the Court why it had not foreseen those time constraints in the spring of 1979 when it had made representations that resulted in dismissal of the GAO protest by Aero and that also would have effectively precluded judicial action.

and unexplained failure to conduct design and procurement of SLEP for the C–130 in a manner permitting the effective review contemplated by statute and the law of this Circuit, the Court concluded:

> The Navy-Lockheed actions [in the last months before the CNM decision to procure on a sole-source basis] served no material planning or operational purpose of the Navy, and had as [their] principal apparent effect frustration of Aero's opportunity to obtain considered review of the decision by GAO and this Court. The Navy [in the months after filing of the action] freely and strongly invoked national defense concerns in pressing the GAO and the Court to act in great haste, to review in days or weeks a decision which the Navy required over two years to make, creating the impression that the Court had a dramatic choice between doing its duty under the law and the Constitution or jeopardizing the Navy's ability to defend the Nation. In these circumstances, the Navy's failure to facilitate GAO consideration of Aero's earlier protests was a breach of its duty, and seriously interfered with the ability of the GAO and of this Court to perform their duties.
>
> Neither of these failures by the Navy justifies interference with its plans for the first 20 planes. However, they do require the fashioning of a remedy that will guarantee that the Navy further considers all possibilities of competing some or all of SLEP for the remaining planes.

493 F.Supp. at 568–69. To this end, the March 1980 Order required the Navy

> [to] continue in good faith to consider the feasibility of competitive procurement for the remaining planes to undergo SLEP, including the use of kits tailored to depot level contractors experienced with the C–130. . . .

493 F.Supp. 570. In addition, the March 1980 Order required the Navy to monitor LGC's work on the first overhaul contracts closely to determine whether kits were necessary,[8] and declared that, as the procurement law required, all prospective contracts or options would be terminable upon determination by defendant that competitive procurement was practical and mandated by law. The Court explicitly based the requirement that the Navy monitor LGC's SLEP experience, and explore use of kits tailored to SDLM and PDM[9] contractors, on DAR ¶ 3–101(d): the Court reminded defendant that "[i]f the nature of the services in SLEP is such that providing limited kits is the only means of obtaining any competition at all, the Navy must do so, if it can be done practically." 493 F.Supp. at 568.

3. Pursuant to the Navy's master schedule,[10] the first aircraft was inducted for SLEP accomplishment at LGC's facilities on May 15, 1980, and other inductions soon followed. A team of Navy aerospace personnel ("the Review Team") undertook on-site study of LGC's progress on the first aircraft, and began to prepare a written report for use by the Navy decision-makers

The Court gave plaintiff's motion for a preliminary injunction all possible expedited consideration, and defendant's established timetable for SLEP of the C–130 aircraft was not disturbed. *See* 493 F.Supp. at 562–66.

**8.** The Court held that it was not irrational or unlawful for defendant to have concluded that even relatively simple "tailored" kits could not be delivered in time for competition of the first group of 13 aircraft. *See* 493 F.Supp. at 568.

**9.** "SDLM" is a Navy term for C–130 maintenance work, "PDM" an Air Force term. PDM contract work has been assumed by the parties throughout the litigation to be sufficiently similar in its technical aspects to SDLM contract work to permit use of the term "SDLM" to

designate the PDM undertaking as well as the SDLM tasks. The Court will conform to the usage, and hereinafter use "SDLM" to refer to both SDLM and PDM work.

**10.** The master schedule provides for regular induction of the 49 C–130 aircraft at intervals spaced to ensure that critical in-fleet strength may be maintained at all times. In the first quarter of 1981, for example, four aircraft, in various stages of SLEP accomplishment, were away from the fleet; by October 1981, each had been returned to the fleet following completion of SLEP and other planes had been inducted. *See* Final Report, *supra* n.3, Figure 10–1.

who would have to determine whether, and when, competition would be feasible, and for presentation to the Court in connection with the litigation.

4. In August 1980 plaintiff moved to supplement the March 1980 Order by requiring defendant *inter alia* to begin the procurement process for the last 29 aircraft scheduled for SLEP in time to permit competition. According to plaintiff, the Navy's conduct in delaying solicitation and evaluation of proposals for the group of aircraft under section 2304(g) would have had the effect of making it impossible to compete contracts for the last group of aircraft in much the same way that the pressure of time made competition as to the earlier aircraft infeasible. Plaintiff also alleged that the Navy's procurement of parts for installation in SLEP in certain configurations and combinations would make SLEP by any firm other than LGC unnecessarily difficult. In August 1980, however, the NAVAIR Review Team was still at work on its evaluation of LGC's performance and the potential for kit-based competition. Moreover, GAO, prompted by an Aero protest filed in October 1979, had under active consideration the reasonableness of the

Navy's decision not to compete a group of the SLEP contracts. Accordingly, in light of GAO's expertise and responsibility for reviewing contract procurement decisions, and reluctant to examine defense-related decisions of the Navy, the Court retained Aero's prayer for an injunction requiring competition under advisement.[11]

5. Thereafter, on December 16, 1980, the Navy reported to the Court that it had decided to award five of the remaining 29 SLEP contracts to Lockheed. The Navy decision was based on a determination that any contractor other than LGC could not be allowed to attempt SLEP performance unless it was required to use so-called "mil-spec" kits. Mil-spec kits would contain, in addition to the parts needed for installation on the aircraft in the overhaul process, all the tools that any firm having the minimum technical qualification for maintenance work on Navy aircraft would possess. The language in the technical directives that would accompany such a mil-spec kit would employ the universal "military specification" terminology comprehensible to any such qualified firm, even if that firm had never worked on the C–130 aircraft before.[12] LGC had previously informed NA-

11. The Navy viewed timely completion of SLEP overhaul on a sub-group of its C–130 fleet designated for service in the TACAMO ("Take Charge and Move Out") program as the most critical of its schedule requirements. The TACAMO aircraft, in class EC–130G/Q, carry heavy communications equipment to provide airborne signals for the Trident ballistic submarine fleet in the event of war, and the aircraft must be available to meet emergency scheduling requirements established by the Joint Chiefs of Staff. In view of the special time constraints for SLEP accomplishment on the TACAMO fleet and the Navy's stated need to install new signals equipment at the same time that SLEP overhaul would be performed, the Navy, on at least one occasion, altered the overall SLEP induction schedule to ensure that the TACAMO program would not be hindered by SLEP. The Court, in August 1980, rejected objections by Aero to schedule alterations deemed necessary by the Navy to accomplish SLEP on the TACAMO aircraft, and requested the advice of GAO on methods for insuring maximum competition on non-TACAMO aircraft in light of the Navy's demonstrated need to accomplish SLEP on the TACAMO aircraft without regard to the larger induction schedule

for the complete fleet. *See* Order of August 15, 1980; Aero Corporation—Navy Request for Advance Decision, B–194445.4 (Comp.Gen. March 27, 1981), C.R. 48. Because the last TACAMO aircraft is scheduled to undergo SLEP induction in fourth quarter of 1982, prior to the time kit-assisted SLEP accomplishment could begin, any affirmative interim relief the Court would consider granting now would not in any way affect SLEP of the TACAMO sub-fleet. *See also* pp. 211–215 *infra* (preservation of master SLEP schedule, for entire C–130 fleet, essential to national defense interests).

12. *See generally* Final Report § 8.3; C.R. 94 at 45 (mil-spec format permits any qualified aerospace firm to "relate [SLEP tasks] to other work they have done in the past.")

The parties have employed the term "tailored kit" to denote a kit whose tool array and level of detail in its technical directives have been adjusted to reflect the less extensive needs of experienced C–130 SDLM contractors in accomplishing SLEP. The salient difference between mil-spec kits and "tailored kits" is thus simply that mil-spec kits would not exclude the tools already possessed by experienced C–130

VAIR that 36 months could elapse after a decision to compete SLEP contracts before those mil-spec kits would be available to a contract competitor. That time lapse, the Navy had found, would involve a militarily unacceptable delay in the SLEP program and thus make competition impracticable.

6. Plaintiff reacted with a motion seeking the sanction of contempt for alleged Navy noncompliance with the Court's March 1980 Order. In doing so, it renewed its earlier prayer for an order requiring the Navy to conduct a competitive negotiated procurement involving, at the least, the three firms that were experienced C–130 maintenance contractors as to the remaining 29 aircraft, as well as any of the 20 aircraft not yet inducted into SLEP. Again, in deference to the Navy and to GAO, the Court retained Aero's motion under advisement and requested GAO to respond to a series of questions framed in a February 26, 1981 stipulation entered into between plaintiff and the Navy.[13] The Court thus requested GAO's opinion whether there was a rational basis for the following decisions by defendant:

(1) The Navy's decision to award installation of SLEP on a sole-source basis;

(2) The Navy's determination that certain kits would be required for experienced C–130 maintenance contractors; and

(3) The Navy's determination that it would require approximately 36 months to prepare the required kits from the time of a decision to procure SLEP on a competitive basis.

See Stipulation & Order of February 26, 1981. In addition, the Court identified for possible consideration by GAO the question whether

SDLM contractors and would not reflect the familiarity of those contractors with the C–130 airframe and components. The scope of "tailored kits," either in their tool array or in the level of detail in their technical directives, has never been defined by the parties in any more precise fashion.

[t]he Navy, in order to maximize competition for future SLEP procurement, has a duty ... to procure immediately the parts, data and tooling that the Navy deems necessary for a competitive procurement and to take the administrative steps that the Navy deems necessary for a competitive procurement.

Id. at 2. In response to this and other Court orders, the Navy and Aero made elaborate submissions to GAO concerning the Navy's December 16, 1980 decision.[14] When, on May 11, 1981, the Navy determined to award all of the remaining SLEP contracts to LGC, plaintiff, defendant and LGC made further submissions to GAO.

*The GAO Opinions*

7. On June 5, 1981, the Acting Comptroller-General submitted his opinion on the issues framed by the February 26, 1981 Stipulation and Order. In brief, the Acting Comptroller-General drew the following conclusions:

a. There is a rational basis for the Navy's determination that "certain" kits are required for performance of C–130 SLEP overhaul by experienced C–130 maintenance contractors other than LGC.

b. Preparation of the kits necessary for competitive negotiated procurement could be accomplished in "considerably less time than the Navy has allocated," and could be completed within 12–18 months' time rather than three years.

c. Because it was not possible, given those two facts and in light of all the other pertinent considerations, to conclude that competitive negotiation was impossible, the Navy erred in prematurely determining that competition under 10 U.S.C. 2304(g) was

13. *Cf. Derecktor v. Goldschmidt*, 506 F.Supp. 1059, 1063 (D.R.I.1980) (court sought GAO opinions in litigation concerning Coast Guard competitive bidding).

14. LGC also made submissions to GAO. Though LGC is not a party to this litigation, its representatives have been in the courtroom during all hearings. *See* 493 F.Supp. at 569.

infeasible and in electing to make a final and complete sole-source procurement from LGC.

 d. The Navy had and has a duty to procure the parts, data and tooling the Navy deems necessary for competitive procurement under DAR ¶ 3–101(d).

8. In response, on June 15, 1981, Aero again moved for a preliminary injunction. While contesting the Acting Comptroller-General's approval of the Navy's finding that certain kits were required, Aero prayed again for an order enjoining the Navy from taking any action or failing to take any action that would delay competition for SLEP contracts among experienced C–130 SDLM contractors. When, however, the Navy sought GAO reconsideration of the Acting Comptroller General's opinion of June 5, 1981, the Court requested GAO to entertain the Navy's reconsideration petition, and retained the latest Aero motion under advisement with all the rest.

9. On August 13, 1981, after argument on the pending motion for preliminary injunction, and pending a GAO response to the Navy's request for reconsideration, the Navy consented to an Order pursuant to which it would take the first administrative step toward competitive procurement: it undertook to contract by September 1, 1981 with LGC for a so-called "Engineering Change Proposal" ("ECP"). The ECP, according to defendant, represented a first step in the competitive process. If the Navy elected to compete the SLEP contract, the ECP would be used to prepare the technical directives or working-papers, also called the air frame change ("AFC"), needed for SLEP by a firm other than LGC.[15] The ECP ordered by defendant pursuant to the Order of August 13, 1981, however, contemplated competition among all qualified aerospace firms rather than a competition limited at the outset to experienced C–130 SDLM contractors. Such an ECP would thus not fully reflect existing tooling and expertise possessed by firms like Aero and Hayes, who were not strangers to C–130 overhaul.[16] The decision to order such a mil-spec-based ECP made it more difficult for defendant to explore fully the possibility of timely competition within the existing C–130 engineering community of LGC, Hayes and Aero.[17]

10. On September 9, 1981, GAO responded at length to the Navy's request for re-

---

**15.** At one hearing, however, the commander of NAVAIR expressed this doubt about the value of the ECP he had agreed to order from LGC at a cost of $100,000:

> In my view, we didn't need the ECP in the first place, except to convince the people that were arguing with me that I was making a sensible decision [not to compete SLEP contracts]. Now, if they are still arguing with me in December [1981], it may be worth two million dollars for the AFC.

C.R. 94 at 52. It developed upon questioning by the Court that the "people" the NAVAIR commander meant to identify included GAO staff who prepared the opinion of June 5, 1981. *Id.*

On the definition and scope of AFC, *see* Final Report at A–12, tit. "Technical Data."

**16.** The Court failed to appreciate at the time that the ECP that defendant undertook to order was a "mil-spec" ECP that would not be readily adaptable to use in a more limited competition involving only LGC and SDLM contractors. When defendant and LGC indicated, in response to questions from the Court, that great inconvenience and expense would result from modification of the mil-spec ECP in the autumn of 1981, the Court vacated so much of its August 13 Order as approved defendant's procurement of the mil-spec ECP. *See* Order of Sept. 28, 1981 ¶ 3.

**17.** Whether or not competition were limited to experienced C–130 maintenance contractors, the conduct of defendant and LGC from the time of the earliest SLEP induction had already made design of an AFC more difficult in another way as well. The Navy permitted LGC to perform SLEP on the early inductees without generating records or reports designed to facilitate translation of the technical data acquired in the early SLEP operations into directives intelligible to other aerospace firms. C.R. 94 at 37–38; *see generally* DAR ¶ 3–101(d). While LGC now could presumably draw on that experience in SLEP accomplishment in generating plans and charts to permit SLEP overhaul by another firm, that process might have been simpler and less time-consuming had the Navy made the effort to require LGC to maintain better records in the first year of SLEP.

The Court had no awareness of this practice by LGC and the Navy until September 1981.

consideration of its June 5 opinion. It rejected each element of the Navy's continued opposition to any further attempt at competition. The Acting Comptroller-General found that the Navy had not justified placing additional noncompetitive C–130 SLEP contracts with LGC. On the question whether the Navy erred in projecting a three-year lead time for kit preparation, the Acting Comptroller-General emphasized that, in himself projecting an 18-month period, he had considered the evidence before him "in light of the court's directions to the Navy to examine the extent to which 'tailored kits' might be used to foster competition." C.R. 84 at 4. The reconsideration petitions by the Navy and LGC, however, apparently had made clear to the Acting Comptroller-General

that [the Navy and LGC] have no intention of tailoring kits to reflect differences in difficulty and risk. . . . Rather they now indicate they plan to describe every task in equal detail, without regard for the skill of experienced C–130 maintenance contractors, notwithstanding the impact this would have by increasing the time required to prepare the technical materials included in the kits.

C.R. 84 at 4–5. According to the Acting Comptroller-General, however,

[the] use of tailored kits reflecting only the minimum necessary technical detail is the lynchpin of our conclusion . . . that it would be proper for the Navy to insist that contractors other than Lockheed use kits.

C.R. 84 at 5. GAO indicated that when it endorsed the Navy decision to require "certain kits" it

did not envision the Navy as writing detailed technical documentation without regard for its needs. Insofar as the record shows, preparation of kit documentation for use by experienced C–130 maintenance contractors should involve little more than documenting tasks which Lockheed has performed on the initial

quantity of C–130 series aircraft to undergo SLEP.

C.R. 84 at 5. Finding the Navy estimates of the time and difficulty involved in the preparation of kits intelligently tailored to the needs of experienced C–130 maintenance contractors therefore to be greatly exaggerated, the Acting Comptroller-General concluded:

there is no impediment of which we [GAO] are aware preventing [the Navy] from conducting a negotiated procurement within the next few months, in connection with which it could properly weigh the relative risks and costs it would incur using proposed alternative approaches.

C.R. 84 at 11–12.

11. On September 11, 1981, the Court held a conference to consider the effect of the Acting Comptroller-General's opinions on the motions pending before the Court. At that hearing a representative of the Acting Comptroller-General advised the Court that executive branch agencies almost invariably comply with decisions of the Comptroller-General concerning the legitimacy of procurement decisions. Counsel for the Navy noted that the responsible Navy officials had not then had an opportunity to study the Acting Comptroller-General's September 9 decision and decide whether to acquiesce in it. In view of the reported practice of agency acquiescence in GAO decisions and the Navy's recent agreement to the Order respecting the ECP, the Court agreed to the request of Navy counsel for a continuance. The Court wished to give high-level Navy executive officers a reasonable time to review and give considered judgment to the immediate implications of the strong GAO opinions of June 5 and September 9, as well as their broader implications, particularly the practice of acquiescence in GAO determinations.[18]

*The Sole-Source Rationale*

12. The Court then held a supplemental hearing on the pending motions on Septem-

18. *See* C.R. 85 at 28 (according to GAO representative, military department ordinarily "complies with a [GAO] recommendation").

ber 25, 1981. Plaintiff, except for brief testimony from one of its consultants, submitted on the record. Defendant filed affidavits and adduced several hours of testimony from Vice-Admiral Ernest R. Seymour, commander of NAVAIR. Admiral Seymour testified that as commander of NAVAIR he reported to the CNM; that the CNM reported to the Chief of Naval Operations; the Chief of Naval Operations reported to the Secretary of Navy. NAVAIR's commander, Admiral Seymour explained, is responsible for procurement of all Navy aircraft and for their support, and this responsibility involves the annual expenditure of about $5.5 billion for procurement and $2.5 billion for maintenance.[19] NAVAIR's "warrant" or responsibility, its commander testified, is to contract legally and "prudently." C.R. 94 at 12–16, 26. No civilian official short of the Secretary of the Navy was identified as having a role in the NAVAIR procurement function, and Admiral Seymour identified neither the Secretary, nor any other civilian, as participating in the decision of NAVAIR and the CNM not to follow the Acting Comptroller-General's opinions. C.R. 94 at 122–23.

13. At the September 1981 hearing, the NAVAIR commander also testified concerning the rationale for sole-source procurement of SLEP for the remaining fleet of C–130 aircraft. That testimony, the admiral's affidavits, and the entire record in this case define the rationale for defendant's repeated decisions to procure SLEP on a sole-source basis as follows:

a. The procurement officers within NAVAIR have had, throughout the SLEP undertaking, three principal concerns regarding SLEP contract procurement and management: adherence to the schedule for induction of aircraft into the overhaul program and for their return to the fleet, maintenance by the SLEP contractor of the technical standards critical to the SLEP undertaking, and prudent use of the public's money to accomplish SLEP. Management of those three objectives—which, as Admiral Seymour stated, may involve trading achievement of one objective for another—often must place considerations of cost after those of scheduling and performance. C.R. 94 at 102–03. The critical mission of the C–130 has made adherence to the SLEP schedule NAVAIR's paramount concern. C.R. 94 at 53.

b. As to the first two concerns, adherence to schedule and assurance of competent performance, LGC has always presented the least risk, among all possible SLEP contractors, of the types of failures that would jeopardize the SLEP undertaking. C.R. 94 at 53–54. This low risk has resulted from LGC's experience with the C–130 as NAVAIR's prime manufacturing contractor for the aircraft, LGC's more recent work as the SLEP contractor, and the generally close relationship of LGC with NAVAIR and NAVAIR's dependence on LGC for technical guidance respecting the C–130.

c. Since 1979, when SLEP procurement began, NAVAIR has believed that competition, even through a negotiated procurement limited to LGC and the few firms experienced in C–130 service and mechanical support, would jeopardize either NAVAIR's adherence to its schedule, or the maintenance of a sufficiently high level of technical performance by the SLEP contractor.

(1) The risk of technical failure in a competitive procurement could be made acceptably low only if NAVAIR procured from LGC, once solicitation and evaluation of proposals were nearly complete, kits for SLEP accomplishment that had been tested and validated as technically adequate by LGC. The production and release to a successful competitor of such kits would, however, have required postponement of SLEP accomplishment for aircraft critically in need of overhaul, and thus have violated NAVAIR's first criterion: that the SLEP work stay on schedule. According to NA-

---

**19.** The admiral may seek the advice of senior officers and technical personnel regarding his decisions concerning procurement programs by convening an Acquisition Program Review Board (APRB). The final authority within NAVAIR for procurement, however, rests with the commander of NAVAIR whether or not he convenes an APRB. C.R. 94 at 16.

VAIR's 1981 timetable, kits would not be available until October 1985, approximately eight months after the last airplane is scheduled to undergo SLEP.[20] C.R. 92 at 2–3.

(2) Adherence to the schedule through a competitive procurement from a firm other than LGC would be possible only if the SLEP contractor began overhaul before kits became available. SLEP accomplishment without the kits required would, however, have entailed unacceptable technical risks. C.R. 92 at 2.

An alternative would have been for NA-VAIR to have ordered the production of kits by LGC (estimated to take 17 months, excluding AFC development) and require on-line, task-by-task validation (at the same time the kits are in production), so that kits might be delivered to a competitor in time for SLEP accomplishment on some aircraft.[21] That alternative, however, would be "imprudent," for at least two reasons:

(1) Because LGC deems on-line, task-by-task kit evaluation to be inferior to complete validation once a kit is fully prepared, such "piecemeal" validation should not be employed. C.R. 84 at 6.

(2) LGC itself requires no kits to perform SLEP. If, following commencement of competition or as a result of competition, LGC were awarded the remaining SLEP contracts, the sums spent on kits would be wasted.[22] C.R. 94 at 26, 62.

14. Within NAVAIR's analysis, evaluation of the competitive option has been linked to an assumption that competition, if attempted at all, should not initially be limited to C–130 SDLM contractors. C.R. 94 at 70. According to the procurement officer, the AFC that NAVAIR would order, for example, would not be addressed only to experienced SDLM contractors, but would be adapted for use by any qualified military aircraft overhaul contractor. C.R. 94 at 75. Moreover, the time NAVAIR would allow for the "competitive cycle," which is the period needed for solicitation and evaluation of contract proposals, contemplated solicitation and evaluation of proposals from firms other than LGC and the C–130 SDLM contractors. C.R. 94 at 74. Indeed, according to its commander, NAVAIR has never undertaken a "formal" or systematic effort to evaluate the practical and legal considerations in competition limited to SDLM contractors and LGC, as against a sole-source procurement, or a competition involving a larger group of aircraft overhaul firms. *Id.* As Admiral

20. Defendant embodied in a chart and filed on September 24, 1981 a complete representation of its estimated time requirements for a kit-assisted competitive procurement. C.R. 92 exh. 3. According to the chart, one year would be needed for engineering design and production of the AFC prior to solicitation and evaluation of proposals. Solicitation and evaluation of proposals would take eight months; six months into the solicitation and evaluation period—called by defendant the "competitive cycle"—kit procurement itself might begin. Procurement and fabrication of the kits would take 17 months. Validation of the kits, followed by "rework," would require nine months, and packaging and shipping two months. The entire process would take about four years, including the time required for preparation of the ECP before work on the AFC began. The ECP actually ordered by defendant in this case required three months from the date of the order to the date of delivery.

The chart prepared by defendant to depict its time estimates for the competitive process appears *infra* in an Appendix to the Memorandum, together with defendant's master timetable for SLEP induction and completion of SLEP on the 49 C–130 aircraft designated for the program, which was also filed September 24, 1981. C.R. 92 exh. 2.

21. This alternative focused upon by Admiral Seymour appears to be a version of the competitive scenario identified in the opinions of the Acting Comptroller-General. Admiral Seymour testified that "the GAO's schedule" was not "prudent." Noting it was his responsibility to "get the most for money," Admiral Seymour indicated it would be fiscally irresponsible to provide the kits prior to the determination whether Lockheed would win the competition.

22. Admiral Seymour noted that the starting date for performance of the work by a competitively-selected contractor might be advanced if funds were spent to procure kits on an expedited basis; but he suggested that such an approach would simply put more money at risk that LGC would win the competition after having been paid for the production of kits it did not need. C.R. 94 at 46–47, 51.

Seymour stated, it has been NAVAIR's position that competition limited to LGC and SDLM contractors would be "competition for competition's sake," C.R. 94 at 73, and would be inadvisable when compared to wider competition within the aerospace industry. C.R. 94 at 73–79. The record thus shows that NAVAIR did not consider with any specificity the costs and potential benefits of such limited competition.

15. At the September 25 hearing, the Court explored with the procurement officer the basis for his preference for industry-wide competition over a more limited competition. NAVAIR evidently considered valuable the "certification" LGC could be required to provide with the fully detailed and tooled mil-spec kits that would be furnished for industry-wide competition. *See* C.R. 94 at 33–35, 75–77, Final Report §§ 8.1, 8.2.1, 8.2.3, 8.4. That certification, as Admiral Seymour indicated, would act as a remote warranty that the ultimate SLEP accomplishment by the contractor actually using LGC's kits would be adequate. *See* C.R. 94 at 75–77. Such a remote warranty might not be available from LGC if less extensive kits were purchased, the Admiral implied. C.R. 94 at 77. The procurement officer also indicated, however, that NAVAIR had not considered whether requiring a direct warranty of fitness as to SLEP accomplishment on a given aircraft by the SLEP contractor that performed SLEP overhaul on the aircraft would be obtainable and, if it were, whether that warranty would be adequate or would be enhanced by an overlapping remote warranty. C.R. 94 at 75–78. If, of course, NAVAIR assumed that it would expect to purchase *full* mil-spec kits even if the SLEP contract went to an experienced SDLM contractor, there would be no advantage—in terms of kit requirements—in limiting competition to SDLM contractors and LGC. Apart from that preference for a remote warranty by LGC that SLEP would be properly accomplished using its kits, NAVAIR's other basis for avoidance of limited competition stemmed from acceptance, as an axiom, of a

principle that competition should be as broad-based as possible. C.R. 94 at 70, 73–74.[23]

16. No study commissioned by NAVAIR has ever assessed the costs and time needed to prepare kits specifically designed for use by experienced C–130 SDLM contractors. No study commissioned by NAVAIR has ever assessed the costs and time needed to prepare the AFC required by experienced C–130 SDLM contractors. No study commissioned by NAVAIR, therefore, has ever determined whether SLEP accomplishment on any number of aircraft under the established NAVAIR timetable for SLEP of the C–130 would be possible through competitive negotiation limited to LGC and other experienced SDLM contractors. NAVAIR never weighed the costs of such a limited competition against the savings that might be achieved through such a competitive procurement.

17. NAVAIR received the mil-spec-based ECP it had ordered from LGC on November 30, 1981. While the ECP was being studied by members of Admiral Seymour's APRB, the APRB also received a report from the Naval Air Rework Facility ("NARF") at Cherry Hill, North Carolina, on prospects for competitive SLEP procurement. Both the ECP and the NARF advice were considered at an APRB meeting held January 14, 1982. Evaluation of the ECP confirmed, in NAVAIR's view, the procurement officer's testimony that the Navy's critical schedule needs for SLEP could not be satisfied through a kit-based competition. The NARF recommendation took a different approach to the same result: officials at NARF, upon reading the ECP prepared by LGC, reported to the APRB that the "complexity" of SLEP was "beyond the scope of a retrofit kit competitive procurement approach." AIR–01 Memorandum dated Jan. 18, 1982 (minutes of APRB meeting) (filed January 19, 1982). The APRB, after examining NARF's position, rejected it, and concluded that competitive

23. Admiral Seymour took the position that competition should include, at its outset, any

potential qualified contractor. *See* Finding of Fact 14 *supra*.

kit-based procurement was not technically infeasible, but (as the procurement officer had advised the Court in September 1981) that it was impossible under the current SLEP schedule. As the minutes of the APRB state:

> ... [T]he Board concluded that the risks associated with the ECP were not technical risks inherent in the ECP itself, but rather in the impact of the associated risks on the program schedule.

*Id.* at 1. The APRB consequently determined to advise the NAVAIR commander not to pursue further competitive procurement for substantially the reasons offered by the NAVAIR commander in his testimony in these proceedings. On the same day that the APRB met, the procurement officer accepted the APRB's advice that "the established SLEP program should continue to completion." *Id.* at 3. The minutes of the APRB offer no indication that the competitive options discussed in the GAO opinions or in proceedings before the Court—including use of "tailored" kits—were considered at the APRB meeting.

*Factors Affecting the Procurement Decision*

18. In NAVAIR's own estimation, LGC is not the only source capable of satisfying the Navy's technical requirements for SLEP accomplishment if parts and kits are available. NAVAIR's judgment on the technical-risk factor,[24] most recently embodied in the minutes of the January 14, 1982, APRB, appears to be based principally on the Final Report of the Review Team assigned to monitor SLEP and to evaluate Hayes and Aero. From the Review Team's Final Report and other parts of the record, these facts have been established:

a. NAVAIR, in evaluating technical capabilities of LGC and other possible SLEP contractors, requires "a high probability of technical success" from any firm awarded a SLEP contract.[25] The Team commissioned to evaluate LGC's early SLEP performance and the capabilities of Hayes and Aero focussed on four broad considerations: the engineering staffs of each of the three firms it examined, the three firms' physical facilities for overhaul work, the availability of parts needed in SLEP accomplishment, and the availability of technical data.[26] Final Report §§ 9.4–9.5.

b. Taking account of all the relevant technical considerations, including parts and technical-data availability, the Review Team prepared at the conclusion of its study a "Technical Risk Assessment" for each of the firms it had evaluated. *See* Final Report §§ 5.1–5.6.5. LGC received the highest score of the three and obtained an "excellent" overall rating. Final Report § 9.5.1. Hayes received an "adequate" rating if furnished kits, and Aero a "questionably satisfactory" rating if furnished kits. Final Report §§ 9.5.2, 9.5.3. Hayes' rating varied from that of LGC principally because, in the Team's opinion, "unplanned parts"—parts discovered to be needed only after overhaul of a given aircraft had begun—were relatively more difficult for Hayes to obtain than for LGC to obtain. Aero's less favorable rating than Hayes and LGC appears to have resulted from that firm's lack of any substantial cadre of experienced and fully-trained engineers; both Hayes and LGC scored well above Aero in that respect. Nevertheless, the Team was not able—perhaps owing to its knowledge of Aero's work as a SDLM contractor, *see* Finding of Fact 18(d) *infra*—to find that

---

24. Applying the risk analysis employed NAVAIR's commander and summarized in Finding of Fact 13, *supra*, these "technical" considerations are to be distinguished from scheduling problems; NAVAIR has always insisted that the schedule for SLEP could not be maintained through procurement from any firm other than LGC. The two factors pertinent to the schedule in NAVAIR's analysis—parts availability and kit production—are discussed *infra* at pp. 196–200.

25. AIR–05A Memorandum to PMA–271 dated Dec. 1, 1980, ¶ 8, C.R. 42F at 5.

26. Each firm was assumed by the Team to have the technical data needed for SLEP accomplishment. LGC already possesses that information, and it would be provided by NAVAIR in any kit furnished to Aero or Hayes.

Aero was an unsatisfactory candidate for SLEP of the C–130. Moreover, the Final Report does not consider the effect of possible changes in the firms' engineering staffs on their relative technical competence or the possibility of NAVAIR's requiring such changes as condition for a SLEP contract award.[27]

c. In sum, it appears from the evidence that while LGC is the firm whose performance of SLEP presents the least risk of technical failure, it is not, according to NAVAIR's criteria and assessment, the only firm technically qualified for the work if kits are available.[28] Final Report § 11.1. The principal technical consideration in which LGC compares favorably to Hayes is parts availability;[29] the principal technical criteria in which LGC exceeds Aero are parts availability and present engineering staff.

d. This assessment by NAVAIR that LGC is superior but has not been proven to be the only firm capable of SLEP accomplishment is not a reversal of a prior position that only LGC could perform the work. It was evident before the Team had prepared its final report that other firms would probably be found to have the technical capability to accomplish SLEP, if provided parts and kits for their installation. Team members noted in 1980 that firms other than LGC at that time did "more replacement of SLEP type items" than did LGC itself.[30] They also indicated, in 1980, that the Team "has seen no technical data so complicated during the SLEP on [the first two aircraft inducted for SLEP] that it would create any risks of a technical nature."[31] They commented that other firms had much of the tooling needed for SLEP already on hand.[32] Thus at the time NAVAIR was developing a procurement program for SLEP of the C–130 aircraft scheduled for induction in the later years of the program, NAVAIR presumably was guided by an assumption confirmed by the Team's final report: LGC might be technically su-

27. This omission is all the more surprising in light of the observations of two of the three principal Navy on-site examiners participating in the Final Report's preparation. Commenting on a draft of the Final Report that is not a part of the record in this case, the examiners, in a memorandum dated November 10, 1980, criticized comparisons of LGC and Aero personnel resources that failed to account for the government's role in building LGC's technical staff. A SDLM contractor would necessarily have a smaller staff at the present than a SLEP contractor would, the examiners noted. The two examiners appear to have concluded that failure to explain the reasons for LGC's substantial engineering advantage over the SDLM firms made the draft they were reviewing "incorrect and consequently... unacceptable" to them as members of the SLEP evaluation team. Exhibit 17, identified in Plaintiff's Attachments to Record References, C.R. 95, as Exhibit 28, at 3 (bound in separate volumes). *Cf. Derecktor v. Goldschmidt,* 516 F.Supp. 1085, 1097–98, 1101–02 (D.R.I.1981) (Coast Guard review team considered "viable" plans of competitor to upgrade facilities and expertise).

28. During the fall of 1981, some officials at the Cherry Point, North Carolina NARF suggested that only LGC could perform SLEP because of technical complexities involved. This advice is, of course, contrary to that of the SLEP Review Team, and it was discussed and rejected by the APRB that met on January 14, 1982. *See* pp. 193–194 *supra.* NAVAIR's view that LGC is technically superior but not the only firm capable of SLEP has thus withstood internal scrutiny by defendant's own technical community. Admiral Seymour's endorsement of the 1982 APRB decision, *see* p. 193 *supra,* is an authoritative statement on the procuring agency's position as to technical risk assessment.

29. The Team's decision to include parts availability in its assessment of "technical risk" is unexplained. The Court, as did Admiral Seymour in his testimony in September 1981, follows the lead of GAO in assessing parts availability as a problem of critical schedule adherence. *See* Finding of Fact 20, *infra.*

30. The observation is contained in a November 1980 memorandum prepared by the three principal on-site examiners. *See* Exhibit 16, identified in Plaintiff's Attachment to Record References, C.R. 95, as Exhibit 23, at 6 (bound in separate volumes).

31. *Id.* at 8.

32. *Id.* at 10. Apparently Team members also observed that LGC's performance on the first aircraft would, in some respects, have been considered deficient according to standards applicable to depot-level maintenance contract work. *See* Exhibit 13, identified in Plaintiff's Attachment to Record References, C.R. 95, as Exhibit 18, at 4.

perior, but it was not proven to be the only known source capable of SLEP accomplishment.[33] The SLEP monitoring study by the Review Team, commenced in the summer of 1980, was NAVAIR's most extended and systematic attempt to evaluate possible SLEP procurement sources. There is nothing in the record indicating that defendant earlier had assumed that technical considerations forbade competition; defendant's position since the beginning has simply been that technical factors required kits.[34]

19. As already noted, NAVAIR has never determined the cost and period of time required for preparation and delivery of kits specifically designed to permit SLEP accomplishment, in a technically satisfactory manner and with acceptable results, by experienced SDLM contractors. *See* Finding of Fact 16, *supra.* However, the following facts, relevant to the calculation of time and cost for kits, are established by the record:

a. LGC, the probable manufacturer of the kits, has completed SLEP on a number of aircraft and has thus performed work on each of the three principal model classes on which later SLEP overhaul has been planned.[35]

b. With regard to technical directives and warrantable written commitments by SLEP contractors that work will be per-

formed in particular ways and with certain results, Aero, as a Navy SDLM contractor, has experience in generating apparently complete and valid descriptions of the tasks required in the SDLM process.[36] There has been no determination and apparently no attempt to determine whether Hayes, as an Air Force C–130 SDLM contractor, has equivalent experience in generating working-papers that also would be useful in stating overhaul warranty terms.

20. GAO undertook what it described as long and careful review of every timetable submitted to it by the Navy regarding the time needed to prepare kits needed for a limited competition among the SDLM contractors and LGC. It also considered Aero's claim that Aero did not need kits to perform SLEP on the C–130. GAO made the following findings:

a. As to the dispute on whether kits were required for SLEP accomplishment by Aero, GAO found that Aero had not demonstrated that the Navy lacked a rational basis for the kit requirement. *See* Finding of Fact 7, *supra.*

b. As to the time required to prepare the appropriate kits, GAO found that close examination of the record before it indicated that the Navy had overstated various periods needed for kit design and fabrication. In the June 5, 1981 opinion, the Act-

---

**33.** Of course, one effect of the passage of time has been to give LGC more experience in SLEP overhaul. But whatever enhancement of LGC's technical superiority that has resulted apparently has not affected NAVAIR's judgment, expressed in the Team's report and affirmed by the January 1982 APRB, that LGC is not the only known source capable of SLEP.

**34.** *See generally* C.R. 94 at 35 (indicating NAVAIR's awareness, after SLEP on first aircraft by LGC, that there was "no question" that other firms could perform SLEP if given "proper instructions" and tooling).

**35.** *But cf.* note 17 *supra* (LGC and NAVAIR failed to record all data useful in design of kits).

**36.** Affidavit of Louis Wiseman (filed November 21, 1979) ¶ 10 at 5 ("[D]etailed instructions for [SDLM] tasks were obtained from the government's standard repair manual for C–130 aircraft or developed by Aero from the drawings and other technical data that Aero has on the

C–130. In each instance in which the detailed instructions were developed by Aero, those instructions were approved by the government.")

A number of the approximately 40 major tasks involved in SLEP correspond, in some degree, with tasks performed by SDLM contractors. *See* 493 F.Supp. at 563. SLEP accomplishment does, however, require the contractor to perform some installations under conditions not required in SDLM work. *See* C.R. 94 at 130 ("zero load" rigging required in SLEP parts installation). And, although Aero claims that it has performed the SDLM tasks corresponding to 80% of all SLEP tasks, the evidence also shows that the SLEP tasks not familiar to a SDLM contractor are among the most demanding and most time-consuming. Those two factors undoubtedly carried weight in the Navy's decision to require kits for a SLEP competition, a decision the Court in its March 1980 Order did not overturn and which has since been endorsed by GAO.

ing Comptroller-General summarized his conclusions in the following statement:

> We do not agree with the Navy that the record shows that it is impossible to complete kit preparation in less than three to four years.
>
> Our analysis of the work required to perform SLEP as disclosed by the Navy's reports indicates that, although preparatory work remains to be done, the Navy as a result of its SLEP monitoring effort now has a fairly broad understanding of the technical problems which may be encountered, generally knows what equipment and locating tooling (tooling used to align parts during assembly) is needed, and has identified much of the technical data which may be necessary to compete its requirements. The record indicates that there is some information which the Navy does not yet have, particularly so-called "fit-up/clamp-up" criteria describing acceptable tolerances, torque to be applied to bolts and similar information concerning the assembly of the parts to be installed in SLEP.
>
> Lockheed, however, does have that data, and the Navy intends to turn to Lockheed to design, fabricate and test any kit which is used. Charts submitted by the Navy with its reports indicate that planned additional engineering can be completed within six months. A Lockheed proposal which that firm submitted to the Navy with regard to KC– and C–130 SLEP kits (which present more difficult work than does an EC–130 kit requirement) is consistent with that estimate and indicates that kit fabrication (assuming parts are available) requires a similar length of time. The cost of the Lockheed design effort in terms of time (manhours) and money (excluding parts) is nominal when compared with the total cost of SLEP.
>
> Nevertheless, the Navy explains that unless it validates kit design by having Lockheed perform trial installation, it rather than Lockheed must assume responsibility for the completeness and accuracy of the kit. The Navy allows approximately a year to perform concurrent validations of one KC– and one C–130 kit.

While we view the Navy's concern in this regard as appropriate, the record does not indicate why the work which Lockheed would perform to prepare kits cannot be overlapped. Assuming parts availability at Lockheed, assembly of the test kits might overlap in part work related to kit design, which largely involves documenting procedures Lockheed is now using. For the same reason, validation through Lockheed test installation might be accomplished in conjunction with SLEP on some of the aircraft currently scheduled for SLEP at Lockheed (which include a KC– and C–130 aircraft scheduled to undergo SLEP early next year). Instead, by assuming a discontinuous Lockheed kit development schedule punctuated by internal Navy review, the Navy has developed an overall kit schedule which produces a finished kit design only after work presently under order at Lockheed will have been completed.

As indicated, the suggested kit preparation schedules include substantial lengths of time for Navy administrative, GAO and judicial review. Some of these time frames are based on average time spent by involved activities on past reviews and do not reflect the time which would be required if available time is critically short. Others can be disregarded. The eight month period allowed for GAO and judicial review in two of the proposed schedules is not relevant to a determination as to whether competition is possible if the Navy acted now to permit it, since if the Navy did so there would be no need for such review. In some of the schedules, time appears to have been allocated twice to correct kit deficiencies by scheduling time after validation is completed even though Lockheed's schedule (on which all of the estimates are based) assumes changes would be made at the time they are discovered. Nor is it apparent why some of the proposed schedules allocate more time to review the Lockheed kit design than Lockheed needs to prepare it in the first place.

The so-called "optimistic" Navy schedule, correcting some of these difficulties, allows considerably less time to Navy review than do the other possible schedules. It, however, remains keyed to parts availability and allows approximately nine months for administrative review.

We believe the optimistic schedule still overstates the minimum time required to design, assemble, and validate an initial kit package, provided the Navy permits Lockheed to perform aspects of the required work concurrently, *i.e.*, to assemble and validate the kits as documentation is prepared and provided the Navy reviews that work while it is in progress. Bearing in mind that Lockheed principally would be documenting procedures which are now being used to perform SLEP, with which the Navy is familiar as a result of the Navy SLEP monitoring study, we believe kit preparation can be accomplished in considerably less time than the Navy has allocated and that it certainly should be possible to complete it within no more than one to one and one half years time.

C.R. 63 at 6–8.

c. At the heart of GAO's difference with the Navy on the time needed to prepare kits was GAO's assumption that the kits would be tailored to the requirements of experienced SDLM contractors performing SLEP. The Acting Comptroller-General stated the difference between his approach and that of the procurement officer in the following terms:

In reaching our decision with respect to whether the kits the Navy says would be required can be prepared by the time they are needed, we recognized that the time needed to prepare such kits would depend upon a number of factors: (1) how detailed the technical instructions included in the kits would be; (2) how many and what types of parts would be furnished in the kits; and (3) whether and if so how scheduling constraints would be interrelated. We also considered the Navy's legal obligations with respect to kit design in light of the court's directions to the Navy to examine the extent to which "tailored kits" might be used to foster competition. The Navy's monitoring study reports state that any kits which are used would be tailored to the skill and experience level of the contractor believed qualified to install them. Taking the Navy at its word that tailored kits would be used, we stated in our June 5 letter that (as we understood what the Navy intended to do) the Navy would prepare kits varying in detail from task-to-task, depending on the Navy's assessment of the degree of difficulty and risk involved in performing each planned SLEP task.

The Navy and Lockheed now dispute this conclusion, contending in effect that they have no intention of tailoring kits to reflect the differences in difficulty and risk associated with particular tasks. Rather, they now indicate they plan to describe every task in equal detail, without regard for the skill of experienced C–130 maintenance contractors, notwithstanding the impact this would have by increasing the time required to prepare the technical materials included in the kits.

C.R. 84 at 4–5. The Acting Comptroller-General explained GAO's assumption that such tailored kits were more appropriate than fully detailed and tooled mil-spec kits in the following way:

Commonly, competition is enhanced if an agency can describe the work to be done under a contract in great detail because a larger class of offerors may be able to compete, or those which do may be able to do so more effectively. The more detail an agency seeks to provide, however, the greater the time which may be necessary to prepare for the procurement. Where, as here, time is of the essence and there are two potential classes of offerors, one which the agency believes can perform satisfactorily if given less technical data than the other, the level of detail insisted upon by the agency, if unrelated to its actual needs, can become an unreasonable impediment to competition.

We did not envision the Navy as writing detailed technical documentation without

regard for its needs. Insofar as the record shows, preparation of kit documentation for use by experienced C–130 maintenance contractors should involve little more than a process of documenting tasks which Lockheed has performed on the initial quantity of C–130 series aircraft to undergo SLEP. Although there are a large number of separately identified SLEP tasks, many of the tasks are relatively simple and straightforward. Only a handful are identified in the SLEP monitoring study as complex enough to require special skill, tooling or care in any particular aspect of the required work. While the few tasks which can be considered to be generally complex (*i.e.*, which potentially involve a number of complex or interrelated functions) involve a significant amount of effort and cost for parts, the sequence of sub-tasks, inspection criteria, tooling, and fit-up/clamp-up criteria which Lockheed has used is known, at least to Lockheed. In fact, were this not so the Navy would have no assurance that *Lockheed* was itself performing the work in a uniform, standardized manner.

C.R. 84 at 5.

21. In the course of SLEP accomplishment on a particular aircraft, the contractor may discover need for "unplanned parts" in configurations that need replacement in the overhaul but that are not on the general SLEP schedule for replacement; only upon disassembly of the aircraft, for example, can the contractor see the deterioration or fatigue in some configurations. *See* Final Report §§ 7.1.5–7.2.7. Since the same parts can be made available to any firm performing SLEP, the length of time required for their procurement does not work for or against SLEP accomplishment by a particular firm. LGC can manufacture some of these parts, and, like other firms, can also purchase the parts directly from suppliers or through the government. For unscheduled parts most easily fabricated or purchased by LGC, of course, LGC is the most convenient SLEP contractor. There is, however, no evidence tending to show that LGC could not supply the unscheduled parts

it manufactures to another SLEP contractor. There is no legal impediment to the Navy's requiring LGC to furnish those parts, at a fair contract price, for SLEP accomplishment by another firm. C.R. 84 at 9. The Navy does not dispute this, but relies upon the evident administrative convenience of LGC's furnishing unplanned parts to itself, rather than to another firm, as a partial justification for the sole-source procurement. However, the Acting Comptroller-General described the Navy's resistance to competition premised on parts availability as follows:

While the Navy might be able to identify some nonscheduled parts as particularly likely to be needed, and thus, include them in kits, use of such parts is defined as outside the planned scope of SLEP, and the Navy argues, most such parts must be provided from contractor inventory or through the Navy C–130 parts supply system.

Lockheed can meet many unexpected parts problems quickly from its own parts inventory, by borrowing parts designated for new production aircraft, or by manufacturing or remanufacturing parts as needed. The Navy, moreover, maintains an extensive C–130 parts supply system, and indeed, furnished approximately 30 percent of the nonscheduled parts used by Lockheed for the first aircraft which underwent SLEP. Maintenance contractors such as Aero also maintain stocks of some C–130 parts.

Notwithstanding the Navy's view that only Lockheed can avoid schedule delays altogether, the Navy has not treated the non-schedule parts problem as insurmountable in its reports, but rather, has assumed throughout this litigation that competition is possible with kits which as indicated would not include most non-scheduled parts. At worst, the Navy's reports indicate that performance of SLEP by a firm other than Lockheed might require that the Navy or its contractor maintain increased stocks of incidental parts. How much time would be required to establish a sufficient inciden-

tal parts inventory is not clear, because the Navy has not addressed this question specifically. However, since long lead time parts are apparently not involved, availability of such parts does not appear to be a factor preventing competition with respect to most if not all of the remaining aircraft.

C.R. 63 at 9. And as the Acting Comptroller-General observed in his second opinion on the SLEP procurement, the Navy has a number of means of insuring that LGC, or any other parts fabricator, will deliver parts needed in connection with another ongoing defense procurement. *See* C.R. 84 at 7–9. There is currently no evidence in the record that the circumstances of this procurement are exceptional in that respect.

*Summary of Findings*

These, then, are the salient facts about defendant's SLEP procurement:

1. Without determining that LGC was the only source capable of SLEP accomplishment, defendant has decided to award all SLEP contracts to LGC on a sole-source basis.

2. Notwithstanding the Court's Order of March 1980 and the advice of GAO in June and September 1981, defendant has taken no steps to develop a kit-assisted competitive negotiation limited to experienced C–130 SDLM contractors and LGC.

3. In reliance upon the possibility of remote warranty by LGC as the kit manufacturer, defendant ordered a mil-spec-based ECP for kit development on or about September 1, 1981. It has never ordered any ECP contemplating kits specifically tailored for use by experienced C–130 SDLM contractors.

4. The Navy failed to estimate the time required for a kit-assisted competitive negotiated procurement from LGC or an experienced C–130 SDLM contractor, or to weigh the cost of such a procurement, or to undertake a comparison of the predictable cost of such a procurement with the costs of the present sole-source contract.

5. According to the Final Report of NAVAIR's SLEP Review Team, kit-assisted procurement of SLEP by a firm other than LGC would be possible, if the necessary parts and other kit components could be furnished the SLEP contractor.

6. In the opinion of the Acting Comptroller-General, prudent kit procurement in connection with competitive negotiation limited to experienced C–130 SDLM contractors would not require so long a time as to make kit-assisted SLEP accomplishment impossible under the current NAVAIR SLEP induction schedule.

## CONCLUSIONS OF LAW

*Jurisdiction*

1. As in earlier stages of the litigation, *see* 493 F.Supp. 558 (1980), this Court has limited subject-matter jurisdiction to review defendant's action under the Administrative Procedure Act. *Kentron Hawaii v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973); *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971); *Scanwell Laboratories v. Shaffer,* 137 U.S.App.D.C. 371, 386, 424 F.2d 859, 874 (1970). *See also Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 244, 455 F.2d 1306, 1312 (1971). Jurisdiction rests *inter alia* on 28 U.S.C. §§ 1331, 2201. The limits on the district court's competence were clearly stated by the *Steinthal* court. As *Steinthal* held, a procurement officer's discretion

extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.... If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion....

*M. Steinthal & Co. v. Seamans, supra,* 147 U.S.App.D.C. at 233, 455 F.2d at 1301 (footnote omitted). Plaintiff bears at this stage of the lawsuit the "heavy burden" of demonstrating that defendant's exercise of discretion had no rational basis, or that defendant's conduct "involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii v. Warner, supra,* 156 U.S.App.D.C. at 277, 480 F.2d at 1169. Our Court of Appeals has recognized that the sensitivity required in judicial review of any aspect of government procurement, *see Perkins v. Lukens Steel Co.,* 310 U.S. 113, 130, 60 S.Ct. 869, 878, 84 L.Ed. 1108 (1940), must be heightened when a procurement officer has acted under authority of 10 U.S.C. § 2304. *Wheelabrator Corp. v. Chafee, supra; see also Cessna Aircraft v. Brown,* 452 F.Supp. 1245, 1253 (D.D.C.1978).

2. The central issue in this case is whether defendant in 1979 and 1980 complied with the requirement of 10 U.S.C. § 2304(g) that proposals be solicited from the maximum number of qualified possible contractors in a negotiated procurement. Plaintiff does not contest defendant's factually-related determination, under 10 U.S.C. § 2304(a)(10), that the circumstances precluded procurement by formal advertising. The procurement officer's decision not to compete the contracts in 1979 and 1980 (as distinguished from his decision not to employ formal advertising) is plainly reviewable. *Cf. Wheelabrator Corp. v. Chafee, supra,* 147 U.S.App.D.C. at 243 n.3, 455 F.2d at 1311 n.3. Actions complaining of erroneous decisions under section 2304(g) are not barred by 10 U.S.C. § 2310(a). *Compare Serv-Air, Inc. v. Seamans,* 154 U.S.App.D.C. 28, 473 F.2d 158 (1972) *with Wheelabrator Corp. v. Chafee, supra.* Since the Navy decisions in this case under sections 2304(a)(10) and 2304(g) are factually related, however, it is noteworthy that section 2310(a), which limits review of procurement decisions by either GAO or a court, makes unreviewable only decisions "required to be

made . . . by the head of an agency." By contrast, the determination made here under section 2304(a)(10) was not made by the agency head but by the military officer commanding NAVAIR. *See* 10 U.S.C. § 2311; *see generally Wheelabrator Corp. v. Chafee, supra.* Moreover, the facts pertinent to a decision under section 2304(g) will always be related to an accompanying decision under section 2304(a)(10). Perhaps because section 2311 makes the decision under 2304(a)(10) delegable, or perhaps because the overall Congressional design seems to require it, that inevitable connection between section 2304(a)(10) findings and subsequent 2304(g) decisions has not rendered actions under the latter section unreviewable in the courts or before GAO.[37] *See, e.g., Serv-Air, Inc. v. Seamans, supra; Continental Business Enterprises v. United States,* 452 F.2d 1016, 196 Ct.Cl. 627 (1971); *Winslow Assocs.,* B–178740 (Comp.Gen., May 8, 1975).

3. In the present case defendant has not directly contested plaintiff's standing to complain of irrational and illegal action under 10 U.S.C. § 2304(g). *See generally Kentron Hawaii v. Warner, supra,* 156 U.S. App.D.C. at 277, 480 F.2d at 1169; *Ballerina Pen Co. v. Kunzig,* 140 U.S.App.D.C. 98, 101, 433 F.2d 1204, 1207 (1970), *cert. dismissed,* 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). The recent discussion of the "prudential" limitations on standing to sue in government procurement cases in *Control Data Corp. v. Baldridge,* D.C.Cir., 655 F.2d 283 (1981), does, however, create a need to evaluate plaintiff's interests, and its standing based on those interests, anew.

a. The opinion in *Control Data* is an important interpretation of the criteria for standing first applied to the procurement setting in *Scanwell Laboratories v. Shaffer, supra.* The Court of Appeals in *Scanwell* held that a disappointed bidder had standing to sue despite the fact that "there is no right [in the *Scanwell* plaintiff] to have the contract awarded to it in the event the

---

**37.** Of course, as the Court of Appeals established in *Wheelabrator,* not all determinations under section 2304(a) would be reviewable.

*See* 147 U.S.App.D.C. at 243, 455 F.2d at 1311 (determination under section 2304(a)(14), nondelegable under section 2311, was "final").

district court finds illegality in the award of the contract [to the successful bidder]." *Scanwell Laboratories v. Shaffer, supra,* 137 U.S.App.D.C. at 376, 424 F.2d at 864. *Control Data,* like the present case, did not involve claims by disappointed bidders; instead, the plaintiffs in *Control Data* were computer firms challenging a decision respecting specifications to be used by potential suppliers of computer products to the government.[38] The government's specifications, the *Control Data* plaintiffs argued, would disfavor them by requiring them to expend large sums to bring their products into technical conformity with the purchasing criteria. Because the government-chosen specifications were allegedly based on those of one of the plaintiffs' leading competitors, International Business Machines Corporation, plaintiffs asserted that the need to adjust their own specifications to those promulgated by the government fell unequally upon them and would "hinder the operation of the desired competition" among computer firms contemplated by the Brooks Act, which amended the Federal Property and Administrative Services Act of 1949. *See* 655 F.2d at 285, 287. The Court of Appeals, applying the "zone of interests" test for standing to sue under a particular statute, recognized that the *Control Data* plaintiffs did not have standing to sue on such a theory. The plaintiffs, the Court of Appeals noted, did not assert the same interest in "competition" that the 1949 Act and the Brooks Act were intended to protect:

> [The 1949 Act and the Brooks Act] express congressional interest in economic and efficient procurement of property . . . [and] in both Congress recognized the maximization of competition as an important means to its objective. . . This interest is not, however, congruent with that interest in competition asserted by appellants. Appellants, as major suppliers, wish to challenge [the government specifications] because these standards

will require appellants to make considerable expenditures of time and money to produce equipment suitable for the government ADP market. Appellants believe that these resulting costs will destroy not only their individual competitive positions but also their collective position as the sole realistic alternative to IBM. Thus appellants' interest in competition is rooted in economic self-preservation.

> The congressional interest in competition . . . is grounded upon a quite different premise. . . . [O]nly one end was sought—lower government ADP costs. . . [I]ncreased competition was expected to inure to the benefit of the government, rather than ADP suppliers.

655 F.2d at 295–96. The requisite "congruency" was lacking, in sum, because the challenged specifications did not abridge the public's interest in competition (protected under the 1949 Act and its amendment) but made participation in the competitive process more expensive for the *Control Data* plaintiffs. That cost of competition for the private firm, as the Court of Appeals stressed, was one Congress had been prepared to impose:

> . . . Congress was determined to obtain an effective I/O interface standard, despite recognition of the possible adverse effects on ADP suppliers such as appellants.

655 F.2d at 296 (footnote omitted). As the Court of Appeals concluded, nothing in the challenged specifications abridged the statutorily-protected interest in competition, and so the *Control Data* plaintiffs could not compel their review under the Brooks Act and the Federal Property Act of 1949 in court. *Id.*

■ b. Applied to this case, the *Control Data* framework simply reinforces the Court's determination that plaintiff, like plaintiffs in numerous government contracts actions before this one, has standing

---

**38.** The specifications, designed to permit government purchase of peripheral computer units from a firm other than the manufacturer of a computer "mainframe" unit already owned

or leased by the government, established "input/output channel level interface standards," or "I/O standards," for integration of different manufacturers' units. 655 F.2d at 286.

to sue and complain of violation of 10 U.S.C. § 2304(g). Aero alleges that it, like all other eligible firms, has been denied the opportunity to compete for SLEP contracts in violation of section 2304(g), much as the *Control Data* plaintiffs alleged that the specifications they challenged effectively denied them the opportunity to compete for computer contracts. The difference is, however, that Aero has been denied *any* opportunity to compete under section 2304(g), not the opportunity to compete on favorable cost terms; its competitive interest, arguably denied by the decisions it challenges, is the same as that of the public which the Armed Services Procurement Act protects. That interest is the interest in competition *vel non*, not competition in which a particular firm is favored. There is, then, no divergence in the interests of Aero and the public under ASPA on the facts Aero pleads: to grant relief vindicating Aero's asserted interest in competition would presumably also vindicate the coincident public interest in competitive procurement under section 2304(g).[39] *Cf. Scanwell Laboratories v. Shaffer, supra,* 137 U.S. App.D.C. at 376, 424 F.2d at 864. By contrast, an order granting the *Control Data* plaintiffs relief from the specifications they challenged would, as the Court of Appeals recognized, have advanced those plaintiffs' economic self-interest without particular regard to the public interest in efficient competition. Aero's interest in obtaining the relief it seeks in this action is perhaps less substantial than that of the public in a competitive procurement; whereas the public interest in competitive procurement will be satisfied with certainty by an injunction that defendant conform to section 2304(g), Aero would take from such an injunction only a chance of winning a competition (if one is found to be required under section 2304(g)). But the extent of the benefit a plaintiff would receive from enforcement of the statute under which it complains is immaterial to standing, so long as the constitutional requirements of legally cognizable

injury-in-fact are met. *Control Data Corp. v. Baldridge, supra,* 655 F.2d at 292; *Constructores Civiles de Centroamerica v. Hannah,* 148 U.S.App.D.C. 159, 165, 459 F.2d 1183, 1189 (1972). Aero's satisfaction of those constitutional requirements is beyond question, and there is no basis for denying it standing under the "zone of interests" test refined by *Control Data.* This result not only is dictated by the *Control Data* analysis, but is consistent with the leading application of the "zone-of-interests" test in the military procurement setting outside our Circuit. *See Hayes Int'l Corp. v. McLucas,* 509 F.2d 247, 256 (5th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1976). Aero, like the public, has an interest in seeing to it that the defendant finds the lowest price possible through competition unless competition is infeasible. Plaintiff therefore has standing to challenge the defendant's decisions not to compete the SLEP contracts and to seek to set them aside if they were irrational or otherwise unlawful.

*The Statutory Framework*

4. The preference for competition in the laws governing public contracts is longstanding. *See generally Paul v. United States,* 371 U.S. 245, 253, 83 S.Ct. 426, 432, 9 L.Ed.2d 292 (1963). In the post World War II era, the circumstances under which military procurement officers may forego the competitive process assured by formal advertising have been strictly limited by statute. Most of the exceptions to the requirement of formal advertising in the present military procurement law were thoroughly codified by the Eightieth Congress in H.R. 1366, and now appear in 10 U.S.C. § 2304(a). *See* S.Rep.No.571, 80th Cong., 2d Sess., reprinted in [1948] U.S.Code Cong. Serv. 1048. Following the end of emergency procurement conducted during World War II, it was Congress' intention to "return to normal purchasing procedures through the advertising-bid method." *Id.*

---

39. Plaintiff could never obtain, and does not seek, an injunction directing award of a contract to itself. Its prayer is simply that the

Navy take the steps necessary for competitive procurement in conformity with section 2304(g).

Among the codified exceptions to the requirement of competition through advertisement was section 2304(a)(10), which was intended by the Eightieth Congress "to place the maximum responsibility for decisions as to when it is impractical to secure competition in the hands of the agency concerned." S.Rep.No. 571, *supra*, at 1055. Section 2304(a)(10) was specifically intended to be "construed liberally" so that non-military review of negotiated contracts effected under that subsection might "be confined to the validity and legality of the action taken and should not extend to reversal of bona fide determinations of impracticability where any reasonable ground for such determination exists." S.Rep.No. 571, *supra* at 1055. It was evidently Congress' intention to encourage supervision of the negotiated procurement process by the military departments themselves, under some supervision by its agent, the General Accounting Office, and, to a perhaps even more limited extent, the courts. *See id.* at 1050, 1055.

5. Nevertheless, increased experience with military procurement in the 1950's suggested to Congress the need for changes in the statutes governing negotiated procurement. The Armed Services Procurement Regulations contained detailed provisions governing negotiated procurements. But Members found that their reliance on the military departments to promulgate and enforce upon themselves rules favoring competitive procurement was, in some degree, misplaced. *See, e.g.,* 108 Cong.Rec. 9971 (June 7, 1962) (remarks of Rep. Van Zandt in debate on H.R. 5532) ("This bill [to amend 10 U.S.C. § 2304] puts into law some of the best of the armed services procurement regulations; and it puts them into law because experience proves they must be made law.... [The regulations] have not been followed as well as they should have been.") In 1962, the Eighty-Seventh Congress accordingly enacted H.R. 5532, which added to the procurement statute what is in substance the current text of section 2304(g). *See* Pub.L.No. 87–653 § 1(c), 76 Stat. 528 (1963). As Representative Hebert, the chairman of the subcommittee responsible for legislative supervision of military procurement, stated in the House debates that led to passage of section 2304(g):

> [The proposed section] is just a simple affirmation of this body in its belief in competitive bidding, in the system that the American people have grown up to know, to give the lowest bidder the contract with the Government and to assure that the competitive mechanism will be used not in part but in the fullest and that the American public and the taxpayer himself will ultimately benefit by this method of operation.

108 Cong.Rec. 9970 (June 7, 1962). The House Report recommending passage of section 2304(g), after reviewing the tendency of the military departments to rely heavily on negotiated procurements under emergency proclamations and departmental regulations, stated that it was the purpose of the bill which included section 2304(g) "to restore the rule of law to the military procurement process" and to regulate more thoroughly the system of negotiated procurement, whose "heavy incidence" the Report attributed to "new and highly technical weaponry and supplies." H.Rep.No. 1638, 87th Cong., 2d Sess. 2, 3. Section 2304(g) was designed to provide "both direction and mandate with respect to negotiated procurement and the method by which it shall be conducted." *Id.* at 3–4. Section 2304(g) was included in the bill passed by Congress over the steadfast objection of the Department of Defense, which insisted that its own regulations were adequate to ensure competitive negotiation in appropriate cases. *See id.* at 9–10 (letter of Defense Department General Counsel to Chairman of House Armed Services Committee). Congress instead heeded the advice of the General Accounting Office, which, in reply to the Department of Defense, commented, "The solicitation of competitive proposals [in negotiated procurements] is basic to protection of the Government's interest in negotiated procurements." *See* S.Rep.No. 1884, 87th Cong., 2d Sess. 21–22 (letter of Comptroller General to Chairman of Senate

Armed Services Committee). In sum, the statutory provision under which this plaintiff states its claim represents both a concentrated effort to enforce the preference for maximum feasible competition, and a deliberate legislative judgment that regulation of the competitive process in negotiated procurement could not be left to the unreviewed discretion of military departments themselves. The General Accounting Office, as Congress' agent in procurement supervision, has accordingly scrutinized military procurement decisions to negotiate contracts on a sole-source basis with great care. At least twice in the last year GAO has found that sole-source procurements by the Department of the Navy were insupportable under the procurement law. *See IBM Corp.*, 81–2 CPD ¶ 258 (1981); *Parker Hannifin Corp.*, 81–2 CPD ¶ 270 (1981). Other jurisdictions have also been alert to "Congress' concept of competitive negotiation" embodied in section 2304(g). *See, e.g., Continental Business Enterprises v. United States*, 452 F.2d 1016, 1020–21, 196 Ct.Cl. 627 (1971).

6. The more general responsibilities Congress has assigned to the General Accounting Office are also relevant in the present case. Since the nineteenth century, the Comptroller-General has had the duty to advise department heads on "any question involving a payment to be made by them." 31 U.S.C. § 74. That fiscal responsibility is comparable to the historic duty of the Attorney General to advise executive branch officers on legal questions, *see* 28 U.S.C. § 512,[40] and has greater functional and constitutional importance today because GAO speaks independently on executive branch action as the agent of Congress, not the President. The Comptroller-General is vested with final authority by Congress to settle accounts, *see* 31 U.S.C. § 71, and has since 1894 had specific obligations to review the fiscal records of the Department of the Navy and to certify the Department's balances. See 31 U.S.C. § 72. The Comptroller-General is required to re-

port to Congress expenditures and contracts it finds to be "in violation of law," 31 U.S.C. § 53(c), and has an important duty to provide opinions to Members on fiscal aspects of the military that may require legislative responses. In 1980 alone, GAO issued Audit Reports to Members and agency officials on three separate matters closely related to the subject-matter of the issues before this Court. *See Annual Report of the General Accounting Office: 1980* 139–41 (1981) (listing (1) GAO investigation of NAVAIR contract practices undertaken at Rep. Downey's request; (2) GAO review of Navy Department's need for contract services to maintain and test the C–12 aircraft; (3) GAO report on claims that Air Force C–130 contract prices were overstated and that proper action had not been taken to improve the contractor's cost accounting and estimating systems).

7. It has recently been observed in the Court of Appeals that "government, in a number of ways, may often require far greater protection in the marketplace than private individuals." *Merck v. Staats, Comptroller*, 665 F.2d 1236 at 1246 (D.C. Cir., 1981) (Mikva, J., concurring in part and dissenting in part). GAO's special functions and expertise in vindicating the public's interest in contract-procurement disputes has been recognized since the time *Scanwell* broadened the scope of government contract litigation. *See, e.g., Wheelabrator Corp. v. Chaffee, supra*, 147 U.S. App.D.C. at 245–48, 455 F.2d at 1313–16; *M. Steinthal & Co. v. Seamans, supra*, 147 U.S.App.D.C. at 227, 455 F.2d at 1305. Similar consideration of GAO's expertise is the rule in other circuits. *See, e.g., Sea-Land Service v. Brown*, 600 F.2d 429, 434 (3rd. Cir. 1979); *Derecktor v. Goldschmidt*, 506 F.Supp. 1059, 1062–63 (D.R.I.1980). Whatever "deference" is owed to GAO determinations must not, however, obscure the duty of the courts themselves to judge the legality of procurement decisions. *See Simpson Electric Co. v. Seamans*, 317

---

**40.** *Cf.* 28 U.S.C. § 513 (Attorney General to advise secretaries of military departments on legal questions "the cognizance of which is not given by statute to some other officer from whom the Secretary of the military department concerned may require advice").

F.Supp. 684, 686 (D.D.C.1970). As Judge Leventhal observed, "the Comptroller General does not claim that his action operates as a legal or judicial determination of the rights of the parties" in a bid protest. *Wheelabrator Corp. v. Chafee, supra,* 147 U.S.App.D.C. at 245, 455 F.2d at 1313. This Court must review defendant's decisions, not GAO's judgments on those decisions. *Simpson Electric Co. v. Seamans, supra.* Nevertheless, a court confronted by the issues raised in a case like this must be guided by what the author of the *Wheelabrator* opinion termed "the 'common law of government procurement'—a body of rulings and determinations emanating from executive officials and the uniquely situated Comptroller General, quasi-judicial boards, and courts." *M. Steinthal & Co. v. Seamans, supra,* 147 U.S.App.D.C. at 233, 455 F.2d at 1301 (footnotes omitted). And, within that body of law, the most coherent general standards for rationality and lawfulness that directly apply to the issues in this case are those developed by the Comptroller-General. Judgmental "deference" is owed to the procurement officer whose decision is under review, *see id.,* 147 U.S.App.D.C. at 231, 455 F.2d at 1299. *Wheelabrator* and *Steinthal* require careful attention to the interpretations placed on the relevant statutes and regulations by the Comptroller-General.[41]

### The Obligation to Pursue Competition

■ 8. Here, as in any other action seeking preliminary injunctive relief, the extraordinary remedy plaintiff seeks is permissible only if there is a substantial likelihood plaintiff would prevail on the merits. *See Sun Ship, Inc. v. Woolsey,* 484 F.Supp. 1348, 1353–54 (D.D.C.1979); *see generally Washington Area Transit Com'n v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 559 F.2d 841 (1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Com'n,* 104 U.S. App.D.C. 106, 259 F.2d 921 (1958).[42] Plaintiff and the Acting Comptroller-General identify two closely-related provisions of the procurement law as the texts by which to measure defendant's conduct. One is section 2304(g) of the Armed Services Procurement Act; the other is DAR ¶ 3–101(d). Plaintiff's theory is that defendant's continued refusal to attempt competition, expressed through defendant's grant of SLEP contracts to LGC on a sole-source basis in 1979 and 1980 and the APRB proceedings in January 1982, violated section 2304(g) and DAR ¶ 3–101(d). The first question posed by this combination of statute and regulation is whether plaintiff can maintain its theory despite its failure also to challenge as irrational defendant's determination under 10 U.S.C. § 2304(a)(10) that competition through formal advertising was "impracticable." The short answer, already suggested by the review of the legislative history of section 2304(g), *see* pp. 203–205, *supra,* is that Congress recognized that procurements not susceptible to formal advertising under the terms of section 2304(a) might nevertheless require competition in a

---

**41.** *See Derecktor v. Goldschmidt, supra,* 506 F.Supp. at 1064–67 (enforcing GAO decision on bid eligibility through declaratory judgment); *see also Derecktor v. Goldschmidt,* 516 F.Supp. 1085 (1981).

**42.** The two-stage inquiry contemplated by *Holiday Tours,* which begins with an examination of the probability of success on the merits and then proceeds if necessary to equitable assessment of public and private interests at stake, *see generally* pp. 211–216 *infra,* parallels the approach established for interim-relief applications in the procurement setting in *M. Steinthal & Co. v. Seamans, supra,* 147 U.S. App.D.C. at 233, 455 F.2d at 1301. The Court notes that the requirement in *Steinthal* that "the aggrieved bidder [demonstrate] that there was no rational basis for the agency's decision"

at the outset of the inquiry, see *id.,* is not in its terms a requirement of simply a substantial likelihood of success on the merits. But the Court does not interpret *Steinthal* to undercut the fundamental assumption of *Holiday Tours* that adjudication of an application for preliminary injunctive relief seldom permits findings of fact as certain or conclusive as those that would be required for entrance of a permanent injunction. *Cf. Sun Ship v. Woolsey, supra,* 484 F.Supp. at 1353–54. Moreover, the already fully-developed record in this case will support the Court's findings with a near degree of certainty. As the protracted history of this litigation suggests, a district court may find itself well into a third year of litigation before effective interim relief can be granted.

negotiated setting. The difference between a decision not to compete through formal advertising and not to compete through negotiation is thus explicit in the statute. That difference has never been in doubt. *See, e.g., Sun Ship v. Hidalgo, supra,* 484 F.Supp. at 1371; *Dynalectron Corp.,* 52 Comp.Gen. 347 (1972). While the same facts may support the reasonableness of elections not to compete either through formal bidding or negotiation, circumstances that would preclude formal advertising might not justify a sole-source procurement. *Dynalectron Corp., supra,* 52 Comp. Gen. at 349–50; *cf. Sun Ship v. Hidalgo, supra.* Plaintiff and the Comptroller General neither contested nor conceded the lawfulness of defendant's election under 10 U.S.C. § 2304(a)(10), and thus there is no occasion for the Court to test it. Deference is owed the decisions that are challenged here, but they are to be judged by the standards applicable to sole-source negotiated procurements in the statute and the regulations.

9. As the Court has found, the evidence supports a determination by defendant that LGC may well be technically superior to all possible competitors in SLEP accomplishment. The evidence respecting parts availability also makes it reasonable for defendant to have concluded that, as far as administrative convenience is concerned, LGC is the firm probably best prepared to perform

SLEP of the C–130. As the Court has also found, however, the evidence refutes any claim that LGC is the only firm technically competent to perform SLEP if kits and parts are available, and this point, far from being denied by defendant, is acknowledged by NAVAIR's own Review Team in charge of assessing technical risk for the SLEP undertaking and was endorsed at the most recent APRB held to consider SLEP.[43] Nor could it be said that only LGC can acquire the parts needed to meet defendant's schedule. Indeed, defendant simply observes that LGC has easier access to most parts than other firms would. Section 2304(g) mandates solicitation of proposals "from the maximum number of qualified sources consistent with the nature and requirements of the services to be procured" when "time of delivery will permit." A key question presented by this case under section 2304(g) is therefore whether the undoubted technical and administrative superiority of LGC as a SLEP contractor provides, in itself, a rational basis for a decision to seek no competitive proposals from other firms.

a. That question has been addressed many times by the Comptroller-General in connection with negotiated procurements effected under statutes and regulations that mandate competition under essentially the same conditions as section 2304(g).[44] Decisions to procure on a sole-

---

**43.** *Cf. Hayden Electric Motor Co.,* 77–2 CPD ¶ 106 (1977) (agency had found alternate source to lack shop and personnel essential for repair contract).

**44.** *See generally* 41 U.S.C. §§ 252(c)(10), 254(a), 41 C.F.R. §§ 1–1.301–1, 1–302–1(b). Negotiated procurement under those provisions is allowed in lieu of formal advertising, 41 U.S.C. § 252(c)(10), where competition through advertising is "impracticable," if such negotiation is in the public interest, 41 U.S.C. § 254(a), and if "proposals . . . shall be solicited from all such qualified sources as are deemed necessary by the contracting officer to ensure such full and free competition as is consistent with the procurement of types of supplies and services necessary to meet the requirements of the agency concerned," 41 C.F.R. § 1–1.302–1(b). Those parallel non-military regulations and statutes arguably enlarge the non-military procurement officer's discretion in their express

advertence to the "public interest." Such language is absent from the military provisions; but this difference does not weaken the significance of the GAO decisions under the non-military provisions for this case. Indeed, the constraints GAO has developed with respect to determinations under the more open-ended non-military statutes and regulations should apply with equal, or greater, force since the military provisions arguably leave somewhat less discretion in the officer's hands. More importantly, however, the military and non-military provisions share that express requirement of feasible competition in negotiated procurements which plaintiff in this case claims defendant has violated. It is unsurprising that GAO itself treats the two sets of regulations *in pari materia* for purposes of the issues to be determined here. *See generally Parker Hannifin Corp., supra,* 81–2 CPD ¶ 270 at 6 (citing *Kent Watkins & Assocs., supra*); *Capital Re-*

source basis are affirmed by GAO unless there is no rational basis for them, *Hayden Electric Motors supra, Capital Recording Co.,* 78–1 CPD ¶ 126 (1978), and the party challenging the decision has a "heavy burden" of proof of irrationality, *Power Testing Inc.,* 80–2 CPD ¶ 26 (1980), *Allen & Vickers, Inc.,* 75–1 CPD ¶ 399 (1975). However, the technical and administrative superiority of a given firm over all other possible sources has never been accepted as a justification for sole-source procurement from that firm. *See Systems Group Associates, Inc.,* 80–1 CPD ¶ 56 (1980). The Comptroller-General has specifically held that the fact that a particular concern could perform a contract with "greater ease than any other concern" does not support sole-source procurement, *see id.* at 4, and a company's past performance experience, enabling it better to anticipate problems in accomplishing the contract tasks, is similarly not a legally adequate basis for sole-source procurement. *Kent Watkins & Assocs.,* 78–1 CPD ¶ 377 (1978). A sole-source award is justified by urgency only if the awardee is the only firm that can supply the item by the required delivery date. *Amdahl Corp.,* 78–2 CPD ¶ 284 (1978). Even a determination that a firm is possessed of superior performance potential and is likely to perform the contract at lowest cost to the government does not spare a procurement officer from the presumption favoring solicitation and evaluation of proposals from other competent firms. *In re Environmental Protection Agency Sole-Source Procurement,* 54 Comp. Gen. 58 (1974). An agency's desire to avoid administrative inconvenience and rely upon an incumbent contractor's experience with its needs—certainly a factor in the present case—is similarly no justification for sole-source procurement. *Kent Watkins & Assocs., supra; see also Precision Dynamics Corp.,* 54 Comp.Gen. 1114 (1975). None of those advantages claimed by a single firm, separately or together, have satisfied the Comptroller-General: unless the awardee was "*the only known source* with the capability to satisfy the procuring activity's re-

quirements," a sole-source decision will be held to have no rational basis. *Systems Group Assocs., supra* at 4 (emphasis added); *cf. Hayden Electric Motor Co., Inc., supra.*

b. The flexibility GAO has always allowed procurement officers to define their own needs, *see, e.g., Interscience Systems, Inc.,* 59 Comp.Gen. 658 (1980), *Capital Recording Co., supra,* thus has never extended to approval of sole-source procurement where the facts show the company selected was not the only one competent to perform the contract. Implicit in that firm principle is an assumption that a procurement officer has not discharged his obligation to pursue competition if, before competition could have begun, he preemptorily selects the "best" company. If there is more than one merely competent firm, then a hard look at the competition may substantially improve the result obtained by the government. *Cf. South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 665 (1st Cir. 1974); *Palisades Citizens Ass'n v. CAB,* 136 U.S.App.D.C. 345, 349–50, 420 F.2d 188, 191–92 (1969); Leventhal, "Environmental Decisionmaking and the Role of the Courts," 122 *U.Pa.L.R.* 509, 511 (1974); Leventhal, "Public Contracts and Administrative Law," 52 *A.B.A.J.* 35, 40–41 (1966).

c. Against that doctrinal background, in the present case the Acting Comptroller-General advised the Court that defendant's decision to procure on a sole-source basis was "premature." *See* C.R. 63 at 8. That conclusion was compelled by the weight of GAO precedent and the fact that, by defendant's own view of the facts, LGC was the best qualified firm for SLEP but was not the only firm so qualified. The Acting Comptroller-General also noted probable violation by defendant of DAR ¶ 3–101(d), which mandates that a procurement officer continually test a decision that only one source exists and so conduct a sole-source procurement as to permit later competitive procurements. *Id.* at 77.

d. This case illustrates well the legitimacy of the Comptroller-General's dis-

*cording Co., supra,* 78–1 CPD ¶ 126 at 4 citing Winslow Assocs., supra).

tinction between findings that a sole-source awardee was superior and that such an awardee was solely qualified to do the work. The particular technical advantages of LGC are important, and should play a critical role in evaluation of proposals. The Acting Comptroller-General's opinions in this case recognized that point. All his rule would have required in this case would have been solicitation of proposals, followed by fair consideration of those received. As the Acting Comptroller-General noted, "[t]he place where... differences [in technical merit] appropriately should be considered is in evaluating proposals in connection with a negotiated procurement." C.R. 84 at 7. The long history of this litigation confirms GAO's general skepticism of early and irrevocable long-term commitments by a procurement officer to a particular source. At the time GAO released its opinion in June 1981, virtually nothing had been done to facilitate competitive procurement of SLEP. Defendant has never explained why the ECP it ordered in late summer 1981, and which it believed critical to the first stages of kit preparation, had not been ordered earlier, as DAR ¶ 3–101(d) would appear to require, in case some firm other than LGC won a competitive procurement. Indeed, the conduct of NAVAIR in the C–130 SLEP procurement has not only lacked rational basis within the terms of the "common law of government procurement" established by the regulations and the Comptroller-General's construction of the statutory limits on sole-source procurement; it has been at war with the even more basic notion that no firm is "best" until the statutorily-mandated exercise of comparing proposals has been completed. The public interest in competition is not vindicated until a procurement officer invites and evaluates proposals from firms that are capable of performing the work. If, in that process, market forces lead a technically-competent firm to make an offer ultimately unfavorable to itself, the procurement officer may decide with competing offers before him

whether the bargain will be so difficult for the offeror to keep that the government's interests will be jeopardized. *Kentron Hawaii v. Warner, supra*, 156 U.S.App.D.C. at 280, 480 F.2d at 1172. But particularly in a negotiated procurement, "[t]he essence of [the] procurement process is that competing offerors must at some point make independent business judgments and stick by them." *Id.*, 156 U.S.App.D.C. at 279, 480 F.2d at 1171. "[I]t is the very difference between one offeror's judgment and that of another which allows the contracting officer to choose the proposal most advantageous to the government." *Id.* By the logic of *Kentron Hawaii*, therefore, the only entity protected by NAVAIR's decisions to procure on a sole-source basis *without regard to competition* was LGC.

 10. As defendant took step after step in 1978, 1979, and 1980 leading toward sole-source procurement of SLEP for the entire C–130 fleet, it was not totally inattentive to the possibility of limited competition. Under the Court's direction, NAVAIR commissioned, in 1980, the preparation of the monitoring study by the SLEP Review Team. The Final Report, indicating that LGC was not the only known source capable of SLEP if parts and kits were available, was not received until September 1981. But defendant cannot maintain that, until it received the Final Report, it was entitled to pursue a sole-source program because LGC was the only firm it was certain could perform SLEP. Such an argument would defeat the presumption in favor of all feasible competition created by section 2304(g). It would also contradict the express terms of DAR ¶ 3–101(d), which places on an officer engaged in a sole-source procurement responsibility for "assuring that competitive procurement is not feasible." DAR ¶ 3–101(d). The deference due a procurement officer's interim assessment of technical competence was not a license to procure on a sole-source basis forever.[45] NAVAIR's critical schedule for

**45.** *Cf. Amdahl Corp., supra*, 78–2 CPD ¶ 284 at 5 (procurement officers properly used delays in contract process to issue amendments to Request for Proposals that GAO found "attempted to enhance competition").

SLEP accomplishment justified defendant in not halting sole-source procurement as to the first group of aircraft slated for induction while competition options were investigated. But the procurement law's preference for competition placed on the NAVAIR procurement officer the duty of investigating competition until he had, as the GAO has repeatedly held, a rational basis for believing that only one source would be capable of performing the contract or contracts he intended to offer. Unless and until a procurement officer makes a rational determination that a single firm is the only possible source for every phase of a procurement, section 2304(g) and DAR ¶ 3–101(d) require a procurement officer to position himself to compete all feasible contracts within the overall procurement. In the present case, therefore, the long pendency of the Review Team's investigation cannot excuse defendant's failure to take steps necessary for competition in the later years of the SLEP project. Certainly, the fact that defendant, in March 1980, commissioned the Review Team, at the Court's suggestion, does not affect the obligations defendant had in March 1980 already neglected for far too long.

a. Under defendant's own time estimate for a kit-assisted competitive procurement, the time needed to deliver kits for use by a SLEP contractor is about four years. Had defendant commenced the process of competition and kit procurement in November 1979, competition—accepting as correct all of defendant's assumptions (seriously questioned by GAO) about the time needed for "prudent" kit assembly—would have been possible for at least 13 aircraft now scheduled for SLEP in 1984 and 1985. Had defendant undertaken the competitive process in March 1980, when the Court remind-

ed it of its obligation under 10 U.S.C. § 2304(g) and DAR ¶ 3–101(d), competition as to a substantial, but smaller, number of aircraft would have been possible. Even as late as August 1980, when defendant persuaded the Court not to supplement its March 1980 Order because defendant supposedly was making best efforts to pursue competition, pursuit of defendant's kit-based competitive negotiation could have resulted in competitive awards for a few SLEP contracts.[45A]

b. Defendant's breach of its duties to consider fully the possibility of competitive procurement was particularly egregious in late November and early December of 1980. The three principal on-site SLEP examiners in the Review Team had reported to their superiors, in a series of memoranda, deep misgivings about the justifications for sole-source LGC procurement based on technical risk and parts availability. They also advised NAVAIR headquarters that they believed competitive options were being unnecessarily foreclosed.[46] Admiral Seymour, replying from NAVAIR headquarters, told the three examiners that "[i]f your position regarding the data is supportable, a substantial amount of *time* could be saved in the competitive procurement process."[47] He added that if the examiners were correct, "cost, schedule, and technical risks can be minimized and a competition is a viable option for some future amount [sic] of aircraft."[48] Admiral Seymour then, however, ordered the three examiners to prepare, with only limited clerical and technical assistance, "all data, drawings, instructions, and procedures needed by competing contractors to develop their proposals on a fair and impartial basis,"[49] and apparently gave the examiners about six days in which to do

---

**45A.** The accompanying Order requires defendant to test its' assumptions about the time required for kit preparation and delivery in light of the Court's decision and GAO's opinions; it thus remains for defendant to indicate the number of aircraft that could now be completed in a limited competitive negotiation involving LGC and the C–130 SDLM firms.

**46.** *See* exhibits 13, 14, 16, 17, identified in Plaintiff's Attachment to Record References, C.R. 95, as exhibits 18, 22, 23, 24.

**47.** *See* exhibit 25, identified in Plaintiff's Attachment to Record References, C.R. 95, as exhibit 31 (emphasis in original).

**48.** *Id.*

**49.** *Id.*

so.[50] LGC and the Navy, by contrast, had spent months developing technical materials for SLEP and have continually represented to the Court that no phase of SLEP technical preparation can be rushed. This initial response[51] by Admiral Seymour, as NAVAIR commander, to the promising and challenging reports of the on-site examiners, suggests inadequate attention to obligations to compete mandated by DAR ¶ 3–101(d) and the Order of March 4, 1980.

■ c. At each stage of the procurement process—before November 1979, in November 1979, in March 1980, and thereafter—defendant was aware it had an obligation to compete SLEP contracts unless the conditions for sole-source procurement under 10 U.S.C. § 2304(g) and DAR ¶ 3–101(d) were met. Defendant knew that LGC was the superior source for SLEP procurement; defendant also knew that other firms, including Aero and Hayes, might be capable of SLEP accomplishment under the NAVAIR induction schedule if kits and parts were available. Nonetheless defendant decided to procure on a sole-source basis from LGC and, perhaps even more erroneously, to omit those steps that might have facilitated competitive follow-on procurements. These decisions and omissions appear to have occurred in "clear and prejudicial violation of applicable statutes [and] regulations." *Kentron Hawaii v. Warner, supra,* 156 U.S.App.D.C. at 277, 480 F.2d at 1169. There is a substantial likelihood that plaintiff will therefore prevail on the merits of its claim that defendant's preclusion of competitive negotiation for the entire C–130 SLEP undertaking is insupportable under section 2304(g) and DAR ¶ 3–101(d). The Court is quite likely to find, as did the Comptroller-General in numerous protest cases, that a procurement officer's belief that one source has particular technical and administrative advantages over any other source does not justify a decision under section 2304(g) to contract

with that firm on a sole-source basis. There is also a strong probability that defendant will be found to have repeatedly neglected the obligations of DAR ¶ 3–101(d) and the Order of March 4, 1980. *See* Order of March 4, 1980 ¶ 5; DAR ¶ 3–101(d).

*The Appropriateness of Injunctive Relief*

■ 11. Proof of a substantial likelihood of success on the merits opens the remedial inquiry required by *Holiday Tours,* and, more particularly in the procurement setting, by *M. Steinthal & Co. v. Seamans, supra.* As the Court of Appeals established in *Steinthal,* once it appears a plaintiff will prevail, the Court still must be satisfied that affirmative relief would be beneficial to the public interest.

> [There are] two interrelated principles which we deem of especial importance for judicial consideration of emergency challenges to determinations of procurement officials: (1) courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) *even in instances where such a determination is made,* there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context.

147 U.S.App.D.C. at 233, 455 F.2d at 1301 (emphasis added). Such a formulation closely corresponds with the traditional balance-of-the-equities analysis. *See, e.g., Washington Area Transit Com'n v. Holiday Tours, supra,* 182 U.S.App.D.C. at 222–23, 559 F.2d at 842–43. *See also Sun Ship v. Woolsey, supra,* 484 F.Supp. at 1353–54. The inquiry concerning the public interest must be particularly exacting in a case where military procurement might be affected by affirmative relief. *Cf. Perkins v. Lukens Steel, supra; Blackhawk Heating &*

---

**50.** *See* exhibit 26, identified in Plaintiff's Attachment to Record References, C.R. 95, as exhibit 32, at 1.

**51.** As they complete their submissions to permit final adjudication on the merits, the parties may wish to establish by discovery, or otherwise, the precise disposition of the examiners' recommendations in late 1980.

*Plumbing Co. v. Driver,* 140 U.S.App.D.C. 31, 35, 433 F.2d 1137, 1141 (1970); *Cessna Aircraft v. Brown, supra,* 452 F.Supp. at 1253. Plaintiff now bears the burden of proving not only that interim relief is required to avoid irreparable injury to its judicially-protectable interests, but also that *Steinthal*'s "overriding public interest considerations" not only permit, but would require, such relief.

■ 12. This case has special features relevant to the inquiry concerning the public interest. Defendant argues that competitive procurement now would be either "impossible" under the current SLEP timetable or "fiscally imprudent." The public interest, defendant clearly implies, would not be served by an injunction its officers could not implement, or by an injunction that would involve more expense than competition could reasonably be expected to save. The opinions of the Acting Comptroller-General provide a direct counterpoint to each of defendant's objections to mandatory affirmative relief now: GAO found that competition was not presently infeasible and, implicitly, that it would not now be fiscally "imprudent" to take the next steps in the competitive process. Resolution of defendant's claims of impossibility and fiscal imprudence therefore requires some examination of GAO's rationale for rejecting them.

a. *Feasibility of competition.* Had defendant rationally concluded that full mil-spec kit-based competitive procurement, as envisioned in its time estimates, was required for timely and technically satisfactory competition of SLEP contracts, there would be no basis for challenging defendant's claim of infeasibility here. The Court, and GAO, should not second-guess defendant on technical judgments respecting kit detail and production schedules. *Cf. Antone v. Block,* 661 F.2d 230 (D.C.Cir.1981). The Court and GAO should see to it that defendant's technical judgment is directed to the relevant question: in this case, is a competition between experienced SDLM contractors using kits designed for use by such competitors feasible and prudent? Defendant has never confronted directly, in its own planning, the question whether experienced C–130 SDLM contractors could perform SLEP, in a timely and technically satisfactory manner, using kits less detailed than the full mil-spec kits needed for industry-wide competition. Those are the "tailored" kits the Court and GAO have repeatedly indicated defendant should consider as a basis for a competitive procurement. Instead, defendant has advanced two separate arguments, that must be tested for rationality, in support of its refusal to consider "tailored" kits and a limited competition. It is this refusal that must be appraised for rationality.

(1) *The preference for remote warranty by LGC.* Defendant considers valuable the warranty that LGC would sell to it, only with mil-spec kits, that SLEP accomplishment by the contractor using the kits will be satisfactory. Defendant's preference apparently is not based upon direct comparison of the benefits and costs of such a warranty with the warranty of fitness the SLEP contractor itself might be required to furnish. *See* Finding of Fact 15, p. 193 *supra.* NAVAIR's commander in his September 1981 testimony, however, indicated that the competition of SLEP contracts could be limited to firms agreeing to warrant their work. C.R. 94 at 78. That admission, in light of NAVAIR's failure to consider the relative advantages of methods of ensuring adequate SLEP accomplishment other than any warranty LGC might furnish, undercuts substantially the mil-spec rationale. NAVAIR must be free to reject a proposal from a technically incompetent firm, or a firm that will not warrant its work. *Cf. Kentron Hawaii v. Warner, supra,* 156 U.S.App.D.C. at 280, 480 F.2d at 1172. Similarly, a comparison of the technical risks incident to SLEP accomplishment with and without the warranty LGC would provide with mil-spec kits might indicate to defendant that mil-spec kits were required. But one unmistakeable cost of the LGC warranty that NAVAIR prefers is preclusion of competition of SLEP. On the present record, the Court must find that the preference for a remote LGC warranty of

timely and satisfactory SLEP accomplishment is not a rational basis for refusing to attempt competition in light of defendant's failure to compare other, possibly less costly methods of ensuring SLEP accomplishment with the LGC warranty.

(2) *The preference for industry-wide competition.* Procurement of mil-spec kits would, of course, permit competition not limited to the experienced C–130 SDLM contractors and LGC. Defendant has indicated that such a broad-based competition should be preferred to a limited competitive negotiation. *See* Finding of Fact 14, pp. 192–193 *supra.* This rationale for requiring mil-spec kits is disingenuous on its face. Although competition obviously should be as broad in scope as possible, a mil-spec-based competition, by defendant's own time estimates, is not now possible, even for the last aircraft currently scheduled for SLEP induction. In the circumstances of this case, defendant's asserted unwillingness to limit competition to the experienced C–130 maintenance firms thus would doom any real chance for competitive procurement. Defendant cannot dispute the simple logic of GAO on this point: if only a limited competition is possible, then it is a limited competition that must be pursued. C.R. 63 at 9; *see also* Finding of Fact 20, p. 196 *supra.*

It therefore appears that neither of defendant's arguments in support of its claim of impossibility reflects a proper exercise of the procurement officer's expertise or otherwise provides a rational basis for a refusal to attempt competition among experienced SDLM contractors using tailored kits. If a preliminary injunction could preserve defendant's ability to study NAVAIR's procurement options, and to discontinue competition if such a procurement method appeared—with rational justification—to be infeasible, defendant's objection to mandatory affirmative relief now based on feasibility should be rejected.

b. *Fiscal prudence of competition.* Apparently assuming that mandatory affirmative relief would require immediate production of all components of the kits needed to assist competition, defendant has challenged GAO's recommendation that competition proceed on the theory that it would be fiscally imprudent. As defendant correctly observes, purchase of kit components not required for SLEP accomplishment by LGC would be unnecessary if LGC prevailed in the competitive process. This objection, too, is weakened by defendant's steadfast failure to explore fully the possibility of competition limited to LGC and the experienced C–130 SDLM contractors assisted by tailored kits. It is impossible now to identify the sum that would be at risk in the acquisition needed to ready kits for such a competitive procurement, simply because defendant has never ordered an ECP or any other study of the scope of the appropriate kits for that limited competition. The Court cannot accept as rational an objection to kit procurement as fiscally "irresponsible" when defendant has never undertaken to measure the sum that might be saved by a competitive procurement against the costs of kit preparation. The estimations required for defendant to support its objection obviously must be approximate. But there is no reason why they cannot be informed and careful ones. Until they have been made, it is impossible to determine what "prudence" requires under the circumstances of this case. Defendant has not even taken the first step, which would be to identify the components needed in the only feasible competition—a competition limited to LGC and the experienced C–130 SDLM contractors—and their reasonably foreseeable cost. Yet, given the broad thrust of defendant's argument that needless parts acquisition should be avoided, it is important to note these points pertinent to kit procurement regardless of the scope and detail of the kits.

(1) A SLEP kit has three components: the parts needed for installation on the aircraft in the overhaul by any contractor, the tools needed to accomplish the overhaul not already possessed by the contractor, and the working-papers or AFC that would guide the contractor and provide the standard for assessing his performance. Final Report, §§ 8.3.1–8.3.3. The first compo-

nent, installation parts, must be acquired whether or not LGC performs SLEP. The third component, the AFC, would be acquired, under defendant's own competitive scenario, prior to commencement of the "competitive cycle" that would determine which firm would obtain a SLEP contract. *See* Chart 1, Appendix p. 217 *infra*. By process of elimination, the only acquisition defendant could consider a "risk," in light of the possibility that LGC might win the competition, is the kit tool array for use by a firm competing against LGC.

(2) Defendant itself (together with LGC) controls the length of time needed to determine whether a firm other than LGC will obtain a SLEP contract, once it has solicited proposals from the potentially qualified firms. If defendant expedited its evaluation of the proposals it receives from the very few firms that would be capable of participation in a limited negotiated SLEP procurement, and defers purchase of particularly costly necessary tooling until its proposal evaluation is complete, it can minimize the risk of unnecessary kit component acquisition. Unless defendant finds, in the course of a cost-benefit analysis it has not yet undertaken, that any competitive procurement would be fiscally imprudent, the public interest will require defendant to determine at the earliest possible date whether a firm other than LGC can win a SLEP competition. For the present, defendant can best serve the public interest in fiscally prudent SLEP procurement by rapid development of engineering designs for kits to assist a competitive negotiation limited to LGC and experienced C–130 SDLM contractors. That process will both enable further cost-benefit analysis on a rational basis, should defendant elect to pursue the analysis, and position defendant for the later steps in competitive negotiation.

13. There is therefore no basis for concluding now that competitive procurement as to some aircraft on NAVAIR's current SLEP schedule is impossible, or that commencement of engineering design and planned parts procurement for kits to assist competition would be fiscally imprudent. There is simply nothing inherent in commencement of competitive negotiation that would be prejudicial to the public interest, so long as the NAVAIR SLEP schedule for induction of aircraft and their return to the fleet is not delayed.[52] Any mandatory affirmative relief the Court would grant must, however, provide that defendant is not required to continue the competitive process beyond a point when it determines, with rational basis, that competition is not required by the statute and the regulations. The preliminary injunction should thus preserve the status quo and the opportunity for a competitive award without preempting defendant's discretion in design of kits or defendant's judgment on whatever SLEP proposals it receives in the negotiation process. Nor should it stop C–130 SLEP inductions scheduled at LGC unless and until a competitor takes LGC's place.

14. A firm in plaintiff's position in this case has no "right" to a SLEP contract, or even to compete for a SLEP contract. *Scanwell Laboratories v. Shaffer, supra,* 137 U.S.App.D.C. at 376, 424 F.2d at 864. Plaintiff has in fact been frozen out of the procurement process by defendant's decisions to procure on a sale-source basis. It is plain from *Scanwell* and its progeny that unlawful government action that would deprive plaintiff of the opportunities of the marketplace establishes the requisite "irreparable injury" which no legal remedy could either value or redress. With each passing month since the first SLEP induction, Aero has been deprived of any opportunity to compete for a diminishing number of SLEP contracts. Given the substantial likelihood of plaintiff's success on the merits, the possibility of designing a remedy now that will vindicate the public interest in competitive procurement, and plaintiff's showing of irreparable injury, the Court must deal final-

---

**52.** It scarcely need be noted that the "brief" delay in SLEP inductions originally sought by plaintiff, *see* Points and Authorities in Support of Application of a Preliminary Injunction at 23 (filed Oct. 30, 1979) could be granted only by impermissibly rejecting *bona fide* assertions by defendant that the national defense requires adherence to NAVAIR's schedule.

ly with this critical institutional consideration: is judicial inaction appropriate here when it is possible Congress may assert its authority and correct *de facto* whatever violation of law exists? [53]

a. When the Court was apprised of the Navy's response to the Acting Comptroller-General's opinions in the autumn of 1981, it suggested to plaintiff that Aero request the Acting Comptroller-General to transmit his findings to the appropriate committees of the Congress. The Court noted it did not wish the Acting Comptroller-General to postpone any such congressional reference out of deference to the Court and its process. *See* Memorandum of Sept. 25, 1981; C.R. 87 at 23 (hearing of Sept. 18, 1981). On November 24, 1981, the General Accounting Office transmitted its opinions to four committees of the Congress. *See* Letters from the Comptroller-General of the United State to the Chairmen of the Senate Committee on Appropriations, the Senate Committee on Governmental Affairs, the House Committee on Appropriations, and the House Committee on Government Operations (ordered filed in Civil Action No. 79–2944 on Nov. 30, 1981); *see also* Letter from the Comptroller-General of the United States to the Secretary of the Navy (ordered filed in Civil Action No. 79–2944 on Nov. 30, 1981).

b. The Court's assumption in the autumn of 1981, perhaps shared by GAO, was that defendant would acquiesce in the advice of the Acting Comptroller-General following the GAO decision in September. The defendant did not do so. Thus an impasse may develop involving the Congress and the Comptroller-General, on the one hand, and the Department of the Navy on the other. This possibility raises a unique separations of powers question. For the Court, the Navy's neglect of its apparent duties under the general procurement law has been complicated by its imperfect response to the Court's prior Orders. The Congress and the Comptroller-General, by virtue of their control over appropriations and disbursement, may have full raw power to interdict the Department of the Navy's decision to continue sole-source procurement of SLEP, should they finally decide to do so. The Navy could, of course, present them with a *fait accompli* in this instance.[54] The record here shows that the Navy is threatening to do so. The record to date also indicates that, unless corrected, the Navy will have so limited its effort to prepare for competition that for Congress or the Court to mandate it at some later date could jeopardize the Navy's defense mission. In these circumstances, a proper regard for the separation of powers concept requires the Court to direct that the Navy prepare for competition without delaying ongoing sole-source procurement of SLEP currently in progress. It may be that, in the end, the Navy will have made it impossible for Congress or the Court to effect competition of any SLEP contracts. But the Congress has not yet reacted to the Acting Comptroller-General's reports. This Court has not yet decided the case on the merits, and Aero apparently still stands ready to compete for contracts and to press these serious issues in court. The present circumstances therefore do not moot the need for judicial efforts to preserve the status quo procurement which, it seems likely, this Court would mandate.[55]

---

**53.** *Cf. Consumer Energy Council of America v. Federal Energy Regulatory Com'n*, 673 F.2d 425 at 478 (D.C.Cir., 1982), (standardless "congressional review," precluding effective judicial enforcement of objective legislative intent in regulatory statutes, may violate separation-of-powers doctrine).

**54.** *Cf. Derecktor v. Goldschmidt*, 506 F.Supp. 1059, 1063 (D.R.I.1980) (Coast Guard noncompliance with regulations was *fait accompli*, but ultimate GAO finding on merits of bid controversy could be enforced by judicial decree).

**55.** In entering this Order, the Court is aware that preservation of the possibility of competition could require expenditure of more funds that the officer in charge of this procurement would consider "prudent." But it appears the law requires no less, and the procurement officer's concern may be relieved in part by the strong views expressed by the Acting Comptroller-General in this matter, and the latter's implication in his opinions for the Court that such an expenditure is proper in the unusual circumstances of this case. 31 U.S.C. § 82d.

15. In the accompanying Order, the Court will not replace the procurement officer's technical expertise with that of GAO or with its own judgment. But as the statutes and regulations require, the Order will enforce the procurement officer's duty to exercise his expertise on which the procurement law depends. The Order directs defendant to undertake engineering design, possibly including (at defendant's discretion) development of a new ECP, for the kits defendant determines are needed for competitive negotiation limited to LGC and experienced C–130 SDLM contractors. Engineering design for such a limited competition should enable defendant to make rational judgments on the cost and feasibility of competitive procurement of SLEP for the remaining C–130 fleet currently scheduled for SLEP. The report that the Order directs defendant to make in three months' time will be an occasion for defendant to present whatever judgment on the advisability of pursuing limited competition that it can make at that time. Defendant may have concluded at that time, or at some other time, that mil-spec kits are required; defendant may also have found that even a limited competition is infeasible or against the public interest. Those findings would be subject to review for rationality, as have been the decisions tested at this stage of the litigation. If, however, defendant, or the Court, finds that competition should be pursued, those first stages of kit design will position defendant to prepare an AFC to be included in the kits. And while work on kit design proceeds now, defendant should take forthwith all other prudent steps to make competition possible. Those steps include acquisition of the installation parts needed by any SLEP contractor, including LGC. Unless and until defendant rationally determines that competitive procurement is not required by section 2304(g), and pending final disposition of the action, defendant must prepare for a kit-assisted negotiated procurement limited to LGC and experienced C–130 SDLM contractors. In addition to requiring commencement of kit design the Order accordingly will require strict adherence to DAR ¶ 3–101(d) and defendant's duty to prepare itself for all competition required by law.

APPENDIX

CHART 1

CHART 2

EXHIBIT 2

---

PRELIMINARY INJUNCTION

For reasons stated in the accompanying Memorandum of Findings of Fact and Conclusions of Law, it is this 18th day of February 1982, hereby

ADJUDGED: that plaintiff will probably prevail on its claim that the decision to procure the Service Life Extension Program (SLEP) for a substantial number of C–130 aircraft without competitive negotia-

tion violates 10 U.S.C. § 2304(g) and the Armed Services Procurement Regulations, ¶ 3–101(d); and it is

ORDERED: that the defendant commence forthwith preparation of such an Engineering Change Proposal (ECP) (*compare* ECP GV–392, filed Nov. 30, 1981) and an Air Frame Change document (AFC) (*see* C–130 Monitoring Study Final Report, § 8.3.3, filed Nov. 16, 1981) as may be needed for C–130 SLEP accomplishment by experienced C–130 Standard Depot Level Maintenance (SDLM) contractors following competitive negotiation limited to LGC and experienced C–130 SDLM contractors; and it is further

ORDERED: that defendant commence to take all other steps necessary to avoid the need for future non-competitive procurement of C–130 SLEP service pursuant to defendant's existing induction schedule, including but not limited to procurement of parts needed for C–130 SLEP accomplishment by Lockheed Georgia Corporation (LGC) and by experienced C–130 SDLM contractors other than LGC; and it is further

ORDERED: that defendant shall on or before May 31, 1982, file a report to the Court as to whether, on the basis of ECP and AFC preparation to that date, competitive negotiation limited to LGC and experienced C–130 SDLM contractors is (1) feasible in light of defendant's existing C–130 SLEP induction schedule and other pertinent considerations, including technical risk factors, and (2) prudent, that is, whether the saving from competition reasonably estimated by defendant is less than the cost reasonably estimated by defendant of conducting such a competitive procurement.